**In the Matter of A.C., a Child in Need of Services,**

**M.C., Mother, Appellant–Respondent,**

**v.**

**Marion County Department Of Child Services, Appellee–Petitioner,**

**Child Advocates, Inc., Co–Appellee–Guardian Ad Litem.**

**No. 49A04–0810–JV–612.**

Court of Appeals of Indiana.

April 28, 2009.

Lilaberdia Batties, Batties & Associates, Indianapolis, IN, Attorneys for Appellant.

Julie Carter, Indiana Department of Child Services, Knox, IN, Inge Myriam Van Der Cruyssen, Child Advocates, Inc., Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-respondent M.C. ("Mother") appeals the juvenile court's order declaring her minor child, A.C., to be a Child in Need of Services (CHINS). Mother argues that there was insufficient evidence to support the juvenile court's CHINS determination and portions of its parental participation decree ("participation decree"), pertaining to substance abuse services and paternity. Finding that there was sufficient evidence to support the CHINS adjudication and insufficient evidence to order Mother to submit to drug and alcohol assessment, random drug testing, substance abuse treatment, and to establish paternity, we affirm in part, reverse in part, and remand with instructions to the trial court to vacate portions of the participation decree.

## FACTS

Mother is the biological mother of A.C., born on November 7, 2006. On August 2, 2007, a judgment of paternity and support was issued, in which C.D. ("Father") was determined to be A.C.'s father. Pursuant to this judgment, Mother was granted custody of A.C., with Father being granted visitation pursuant to the Indiana Parenting Time Guidelines.

According to the probable cause affidavit, on April 30, 2008, Monique Miller, a family case manager for the Marion County Department of Child Services ("DCS"), visited the home of Father and L.D. ("Stepmother"). Miller was there on a routine visit concerning another child belonging to Father and Stepmother. Father was living with his mother ("Grandmother") at the time because a pending charge of child molestation prevented him from having unsupervised contact with his children. When Miller visited the home, Father was participating in a supervised visit with his children at Stepmother's residence.

During the visit, Miller was introduced to A.C. Miller learned that A.C. was eighteen months old and had been dropped off to Father by Mother over thirty days prior to that day. Father took A.C. to live with Stepmother.

On May 9, 2008, Monica Patterson, a public health nurse with the Marion County Health Department, visited Stepmother's home regarding one of the other children. Patterson became concerned about A.C.'s developmental delays, such as her lack of speech and poor balance when walking. Patterson was also concerned with A.C.'s poor hygiene, lack of immunizations, and Mother's unknown whereabouts. Patterson informed Miller about her concerns.

On May 10, 2008, Miller stopped by Stepmother's residence. When Miller asked Stepmother about a doctor's appointment for A.C., Stepmother responded that A.C. had an appointment, but she could not recall the day or time. Stepmother informed Miller that there had been no contact with Mother. Miller not-

ed that A.C.'s overall appearance was poor, as evidenced by a foul odor, soiled cloths, and oily hair.

On May 16, 2009, Miller met with Patterson, Darcy Milner, a district social worker, and Cheryl Colver, a public health nurse, at Stepmother's residence. They discovered that A.C. still had not been given her immunizations. Stepmother had been informed by the Marion County Health Department that she would be unable to get A.C.'s immunizations without a birth certificate, and she could not get a birth certificate without Mother's presence. Stepmother explained that she did not know Mother's whereabouts. During the visit, Miller, Patterson, Milner, and Colver observed a foul odor coming from A.C.

Miller conferred with her supervisor about the conditions of Stepmother's home and A.C.'s appearance. It was decided that A.C. would be taken into custody, and the Indianapolis Metropolitan Police Department was called for assistance during the removal. A.C. was taken to Youth Emergency Services, where it was discovered that she had blisters caused by a severe diaper rash.

On May 19, 2008, Mother contacted DCS about A.C. Mother refused to provide any information regarding her address, phone number, or where she had been for the past several weeks when A.C. had been residing with Stepmother.

In its CHINS petition, the DCS alleged that A.C. was a CHINS because Mother "has abandoned the child and has not demonstrated the ability or willingness to parent the child at this time." Appellant's App. p. 19. Furthermore, the petition alleged that Father "has extensive history with DCS and a pending criminal case involving child molest of an older child." *Id.* Finally, DCS alleged that Stepmother had "failed to appropriately care for the child, obtain timely medical care, and was unable to adequately address the child's needs due to her lack of legal custody." *Id.*

On May 20, 2008, an initial hearing was held in which the juvenile court determined that there was sufficient evidence to support DCS's probable cause affidavit alleging that A.C. was a CHINS. In addition, the juvenile court concluded that no efforts were made to provide family services before removal because "an emergency nature precluded services," however, "[t]he efforts made to prevent removal of the child were reasonable." *Id.* at 34. Moreover, the juvenile court ordered that A.C. be a ward of DCS, but that the DCS would supervise visitation between the child and the parents.

On July 25, 2008, a factfinding hearing was held. Mother testified that four days before Easter, she took A.C. to Grandmother's house for a supervised visit with Father. On Easter, when Mother went to pick up A.C. at 4:00 p.m., A.C. was not there and Grandmother would not tell Mother where A.C. was or how to contact Father. Mother stated that she went to Father's residence, but no one was there. Mother further testified that she went to Father's residence on four different occasions, but was unsuccessful in locating him or A.C. In addition, Mother called Grandmother on four separate occasions, but she would not reveal Father's or A.C.'s location.

On August 22, 2008, the juvenile court entered findings of fact and conclusions of law, finding in relevant part:

8. [Mother's] whereabouts were unknown when the CHINS petition was filed.

9. [Mother] has missed the last three visits with the Child and has had only three or four visits with the Child in the

two month period since the CHINS was filed.

\* \* \*

12. The public health nurses observed the child to be developmentally delayed; not walking as a child her age should and having poor language development and were concerned about her well being.

\* \* \*

17. Once the child was placed in Ms. Doyan's care, the Child ate voraciously initially and was under weight [sic] at the 25th percentile and now the Child has gained weight and is at the 50th percentile for weight.

16. [sic] The child is receiving therapy through First Steps and is benefiting from these services.

\* \* \*

19. Once the child was in foster care, she began to have appointments each week either for speech therapy or for other treatments due to her developmental delays. Her vocabulary has increased from three to four words to about twenty.

20. [Mother] moved to her present four room residence shared with two adults and a seven year-old child a week before the fact finding hearing. She moved several times between the CHINS filing and the date of the fact finding hearing living in Hendricks County, Bloomington, and Indianapolis.

21. Paternity was established for the child on August 2, 2007.

\* \* \*

CONCLUSIONS OF LAW

1. The above named child's physical or mental condition is seriously impaired or endangered as a result of the inability, refusal, or neglect of her father and mother to supply the children [sic] with necessary food, clothing, shelter, medical care, education, or supervision. [DCS] has presented probative evidence that the child would be at a substantial risk of neglect and/or abuse if she were to remain in the care of [Mother] or [Father].

2. [DCS] has met its burden of proving the allegations contained in its Petition Alleging Child in Need of Services, filed on or about May 20, 2008, by a preponderance of the evidence.

3. [Father] is an inappropriate person to care for the child when the CHINS petition was filed and at the time of trial because ... he was convicted of child molesting[,] a class C felony, and is presently incarcerated in the Indiana Department of Correction.

4. The court finds it is unlikely that the child would have received the medical care and other services offered through [DCS] and First Steps in the care of [Father] or [Mother].

\* \* \*

6. The Court finds that the home described by [Mother] and her witness is not adequate for placement of this child.

7. The child had improved greatly and is progressing in foster care and this progress and improvement likely would not have occurred if the child was in the care of [Mother].

8. The Court finds that [Mother] and [Father] are not likely to engage in any services without the filing of the CHINS petition and therefore the coercive intervention of the court is required.

9. [Mother] has failed to demonstrate an ability to provide for the mental, physical, and emotional needs of the child by her inability to visit regularly,

her several moves during the pendency of this case, and her unstable employment and housing situation, and her failure to adequately address the developmental needs of the Child.

10. The child needs care, treatment, or rehabilitation that she is not receiving and is not likely to be provided or accepted without the coercive intervention of the Court.

11. [A.C] is a Child in Need of Services as to [Father] and [Mother].

*Id.* at 61–62.

At the dispositional hearing, which commenced on September 12, 2008, the juvenile court ordered that A.C. be removed from Mother and Father and be placed with DCS. In addition, the juvenile court ordered Mother to participate in services, including drug and alcohol assessment, random drug testing, substance abuse treatment, and to establish paternity. The plan for permanency was reunification with the parents. Mother now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

Mother argues that there was insufficient evidence to support the juvenile court's order finding A.C. to be a CHINS and the participation decree requiring Mother to participate in substance abuse assessment and treatment, random drug testing, and to establish paternity.

■ Although we have recognized that the right to raise one's children without undue interference from the State is protected by the Fourteenth Amendment to the United States Constitution, a parent's constitutionally protected right to raise his or her child is not without limitation. *E.P. v. Marion County Office of Family & Children,* 653 N.E.2d 1026, 1031–32 (Ind. Ct.App.1995). Specifically, "[t]he state has a compelling interest in protecting the wel-

fare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment are at issue." *Id.* at 1032.

A child is a [CHINS] if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind.Code § 31–34–1–2. DCS has the burden of proving by a preponderance of evidence that a child is a CHINS. I.C. § 31–34–12–3.

■ In considering the evidence supporting a CHINS determination when the juvenile court made findings of fact and conclusions of law, we apply a two-tiered standard of review and may not set aside the findings of judgment unless they are clearly erroneous. *Parmeter v. Cass County Dept. of Child Servs.,* 878 N.E.2d 444, 450 (Ind.Ct.App.2007). We first consider whether the evidence supports the factual findings and then whether the findings support the judgment. *Id.* Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* We give due regard to the juvenile court's ability to assess witness credibility and do not reweigh the evidence, instead considering the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.*

## II.  CHINS Determination

### A.  Inability, Refusal, or Neglect to Provide Necessities

■ Mother argues that the evidence was insufficient to show that A.C.'s physical or mental condition was seriously impaired or endangered as a result of Mother's inability, refusal, or neglect to supply A.C. with the necessary food, clothing, shelter, medical care, educational, or supervision.  Specifically, Mother argues that the conditions in which A.C. was found by the DCS were not the result of any voluntary conduct on her part because Father had taken A.C., and Mother was unable to find her.  Mother insists that it was Stepmother who was responsible for A.C.'s condition.

In the instant case, Patterson testified that when she visited Stepmother, A.C. was very pale, had sparse hair, and was developmentally delayed.  Patterson stated that A.C. walked with a "wide gate [sic]" that was "more like ... a twelve month old."  Tr. p. 11–12.  Patterson also expressed her concerns regarding Stepmother's inability to obtain medical care for A.C. because she did not have guardianship over the child.  Patterson stated that A.C. "[a]bsolutely" needed to see a physician.  *Id.* at 12.

When A.C. was placed in foster care, she was underweight, behind on her vaccinations, was dirty, had difficulties walking, and had an abnormal hip, which was diagnosed as "hypersubluxation of her left leg."  *Id.* at 56–57.

Mother testified that she had moved several times during the pendency of the CHINS proceeding.  Mother testified that if A.C. was returned to her care, her housing would consist of a two-bedroom trailer that would be shared by three adults and two children.  Mother stated that the last time she had been employed had been in 2007 for about five months.

Mother's lack of cooperation with DCS since the filing of the CHINS petition also highlights Mother's inability or refusal to properly care for A.C. Specifically, Naomi Boone, the DCS case manager who was assigned to A.C.'s case around June 24, 2008, testified that she had left five telephone messages stating that she needed to talk to Mother, but her calls were never returned.  Mother failed to attend three scheduled visits with A.C. In light of all these circumstances, we cannot say that there was insufficient evidence to show that A.C.'s physical or mental condition was seriously impaired as the result of Mother's inability, refusal, or neglect to provide the necessary clothing, food, shelter, medical care, or supervision.

As for Mother's argument that she was not responsible for A.C.'s condition when she was removed by DCS, the record indicates that Mother had sole legal custody of A.C. Ex. p. 5. There is no evidence that Mother contacted law enforcement or DCS for assistance in locating A.C, even though she claims that she did not know where A.C. was for nearly two months.  Indeed, it appears that Mother made only feeble attempts to locate A.C. Therefore, Mother's contention that she is not responsible for the condition in which A.C. was found by DCS is not persuasive, and consequently, this argument fails.

### B.  Coercive Authority of the Court

■ Mother contends that the CHINS decree must be set aside because there was insufficient evidence to prove that the coercive intervention of the court was necessary to force her to provide A.C. with necessary care and treatment.  Mother points out that she had availed herself of

TANF,[1] food stamps, and WIC [2] to provide for herself and A.C.

As stated above, when A.C. was placed in foster care, she was underweight, behind on her vaccinations, dirty, had difficulties walking, and had an abnormal hip, which was diagnosed as "hypersubluxation of her left leg." Tr. p. 56–57. At the factfinding hearing, when Mother was asked about her knowledge regarding A.C.'s speech and walking difficulties, Mother responded that "I don't think it was a big concern for me [be]cause she was to me developing correctly." *Id.* at 43. Mother testified that A.C. "[did not] have a doctor right now." *Id.* at 45. Furthermore, Mother stated that she was not aware that A.C. had a heart murmur because "it was not caught when she was born." *Id.* at 46. Finally, Mother admitted that A.C. had been late getting her shots, but testified that she did not think that she had been negligent in caring for A.C.

These circumstances show that Mother has consistently failed to provide A.C. with necessary care and treatment. Indeed, it was not until A.C. was placed in foster care that she became current on her immunizations. Since being placed in foster care, A.C. is receiving physical and speech therapy for her developmental delays. A.C.'s heart murmur was not discovered until A.C. was placed in foster care. Therefore, even though Mother has availed herself of means to provide for A.C, we cannot conclude that the coercive intervention of the court is unnecessary.

Nevertheless, Mother appears to argue that she did not abandon A.C. as alleged in the CHINS petition and, therefore, the coercive intervention of the court is unnecessary. In other words, it seems that Mother is asserting that she did not abandon her child and therefore, the court does not have to intervene to force her to properly care for A.C.

■ As an initial matter, we note that the DCS does not need to show abandonment before a juvenile court may conclude that the coercive intervention of the court is necessary or before a child may be adjudicated a CHINS. Thus, we need not address this argument. *See In re V.C.,* 867 N.E.2d 167, 180 n. 2 (Ind.Ct.App.2007) (concluding that the court did not need to determine whether the evidence was sufficient to support findings that were not necessary to support the CHINS adjudication).

In any event, the record indicates that A.C. had been living with Stepmother for over thirty days when DCS learned of her presence in the home. When A.C. was removed from Stepmother's home, Mother's whereabouts were unknown. Finally and as previously discussed, Mother made only feeble attempts to locate A.C. Therefore, Mother's argument that she did not abandon her child does not support her contention that the juvenile court erred by concluding that the coercive intervention of the court was necessary.

1. TANF stands for Temporary Assistance for Needy Families, and provides assistance that is "time-limited and promotes work, responsibility, and self-sufficiency." U.S. Department of Health & Human Services, Administration for Children & Families, http://www.acf.hhs.gov/programs/ofa/tanf/about.html (last visited April 7, 2009).

2. The Women, Infants, and Children (WIC) program is a federal grant program that "serves to safeguard the health of low-income women, infants, & children up to age 5 who are at nutritional risk by providing nutritious foods to supplement diets, information on healthy eating, and referrals to health care." U.S. Department of Agriculture, Food and Nutrition Service, http://www.fns.usda.gov/wic/aboutwic (last visited April 7, 2009).

### III. Participation Decree

Mother argues that there was insufficient evidence to support the juvenile court's participation decree ordering Mother to participate in and successfully complete a drug and alcohol assessment, including intensive outpatient treatment or inpatient treatment as recommended by evaluations. Mother maintains that the juvenile court erred in ordering her to submit to random drug testing and to complete a substance abuse treatment program because there was no evidence in the record that Mother had a drug or alcohol problem. Mother further contends that the juvenile court erred by ordering her to establish paternity because paternity had already been established in August 2007.

Indiana Code section 31–34–20–3 provides:

If the juvenile court determines that a parent, guardian, or custodian should participate in a program of care, treatment, or rehabilitation for the child, the court may order the parent, guardian, or custodian to do the following:

(1) Obtain assistance in fulfilling the obligations as a parent, guardian, or custodian.

(2) Provide specified care, treatment, or supervision for the child.

(3) Work with a person providing care, treatment, rehabilitation for the child.

(4) Participate in a program operated by or through the department of correction.

■ In its findings of fact, the juvenile court found that "[Mother] agreed that she needed the services being proposed by the [DCS] but disagreed that she needed any substance evaluation services." Appellant's App. p. 61. There is no other reference to any alleged substance abuse in the findings of fact or conclusions of law. In addition, after reviewing the record, we are unable to find any allegation or even an indication that Mother has a substance abuse problem. The evidence does not support the juvenile court's participation decree requiring Mother to submit to drug and alcohol assessment, random drug testing, and substance abuse treatment. Consequently, these requirements must be vacated.

■ In its findings of fact, the juvenile court determined that paternity had been established on August 2, 2007, and the judgment of paternity and support was entered into evidence as Respondent's Exhibit A. Ex. p. 4–5. Thus, the findings of fact do not support the juvenile court's participation decree ordering Mother to establish paternity for A.C., and this requirement must also be vacated.

■ It appears that the juvenile court was utilizing mere boilerplate language in its participation decree ordering Mother to submit to drug and alcohol assessment, random drug testing, substance abuse treatment, and to establish paternity. The use of boilerplate language can make the citizenry cynical about the requirements necessary to achieve the goals of a CHINS adjudication. Although the juvenile court has broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstance that was revealed by the evidence.

■ The plan for permanency is reunification with the parents. This plan is not furthered by ordering Mother to participate in services that are unnecessary to address a behavior or circumstance that is relevant to A.C.'s removal from her care. Indeed, forcing unnecessary requirements upon parents whose children have been adjudicated as CHINS could set them up for failure with the end result being not only a failure to achieve the goal of reunifi-

cation, but potentially, the termination of parental rights. *See* I.C. § 31–34–16–4 (stating that the juvenile court "shall advise the parent that failure to participate ... can lead to the termination of the parent-child relationship"). These possible ramifications are inconsistent with the general requirement that "the [DCS] shall make reasonable efforts to preserve and reunify families," I.C. § 31–34–21–5.5, and unduly interfere with the parent-child relationship.

The judgment of the juvenile court is affirmed in part, reversed in part, and remanded with instructions to vacate portions of the participation decree consistent with this opinion.

MAY, J., and BARNES, J., concur.

