**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 13 2014, 10:00 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JENNIFER A. JOAS**
Joas & Stoats
Madison, Indiana

ATTORNEY FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHRISTINA D. PACE**
**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| T.D., a child in need of services, Ti. D., a child in need of services, | ) |
| | ) |
| | ) |
| T.D., father, | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | )   No. 15A05-1403-JC-116 |
| | ) |
| DEARBORN COUNTY DEPARTMENT OF CHILD SERVICES, | ) |
| | ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause Nos. 15C01-1308-JC-28 and 1308-JC-29

**November 13, 2014**

**BARNES, Judge**

## Case Summary

Th.D. ("Father") appeals the finding that his children are children in need of services ("CHINS"). We affirm.

## Issue

The issue before us is whether there is sufficient evidence that Father's children are CHINS.

## Facts

In the summer of 2013, C.D. ("Mother") and Father separated and began the process of divorcing, and matters became highly acrimonious.[1] Both parties obtained protective orders against the other. On July 19, 2013, Father contacted the Department of Child Services ("DCS") to report that Mother was physically abusing their children, T.D. and Ti.D., and using drugs in the house. T.D. was eleven at the time, and Ti.D. was eight. The children told a DCS caseworker that they were afraid of Mother and described an incident in which Mother hit Ti.D. over the head with a hairbrush, causing it to break. Ti.D. also told of once being whipped with a belt by Mother. The children also said they had witnessed Mother smoking marijuana and that they felt safe with Father, but not Mother. Shortly after the initial DCS report, the children attempted to run away from Mother's house. DCS was considering placing the children with Father, but it did not do so after

---

[1] The current status of the divorce case is unclear. There was some mention in the record that that case has been put on hold pending resolution of this CHINS action.

Father was arrested in early August on an invasion of privacy charge for allegedly violating the protective order Mother had against him. Father also has a 2011 arrest for physically abusing a stepchild, a claim that DCS substantiated. Mother has two theft and two battery convictions and apparently was facing a conversion charge for shoplifting at the time the children were removed. At some point—precisely when is unclear—Mother accused Father of raping her, but he was not immediately arrested after the accusation was made.

On August 5, 2013, the Aurora Police Department searched Mother's residence and found K2, or synthetic marijuana. T.D. said that the substance belonged to Mother. Thereafter, the children were removed from Mother's care and placed in a foster home. At the time of removal, both children were in "excellent" physical health and had no mental health issues, aside from Ti.D. having been previously diagnosed with ADHD. App. pp. 30-31. Ti.D. was being treated for her ADHD with medication originally obtained by Mother and Father. After being placed in foster care, the foster parents noted hoarding-type behaviors by Ti.D. Ti.D. also sometimes hit herself on the head when upset or stressed.

The trial court authorized the DCS to file a CHINS petition and originally scheduled a fact-finding hearing for August 27, 2013. After several continuances, the CHINS fact-finding hearing did not begin until December 20, 2013, and then was continued to January 27, 2014.

Between the filing of the CHINS petition and the completion of the CHINS hearing, the children continued to reside in foster care. During this several-month time frame, Mother underwent individual counseling and was released after successfully completing it.

3

Mother also was on medication for depression/anxiety and seizures. Mother and Father each underwent a number of drug tests. All of Mother's tests were negative for any illicit substances. All of Father's tests likewise were negative, except for one test suggesting he had taken more than his therapeutic dosage of Oxycodone, for which he had a prescription.

Father had visitation with the children that was supervised by Chuck Satterfield, who also provided parental counseling to Father. Satterfield said that Father initially was reluctant in August 2013 to engage in supervised visitation, but he had changed his mind a week later and regularly had visitation thereafter. Satterfield only had one concern regarding Father's visitation with the children, and that was his occasional negative comments about Mother to the children. Satterfield would redirect Father from making such comments; as time passed, Father improved in this regard. Otherwise, Satterfield had no concerns about Father's visitations or his care of the children, finding him and the children to be affectionate and to have a good time together. Satterfield also believed Father corrected the children appropriately and did not witness any inappropriate behavior by him.

Mother's visitation originally was supervised by Aimee Steele, until mid-August 2013. Steele had some concerns about visitation because of what the children had reported regarding abuse by Mother, but she did not personally observe anything of that nature. Steele also observed some early visits by Father and had no concerns, except for one visit during which Father initially asked T.D. not to cooperate with DCS, but by the end of the visit Father was urging T.D. to cooperate.

After Steele left the case, Mother's visitation was supervised by Leslie Cooper, who

4

also worked with Mother individually. Cooper reported that the visitations always went well, that the children were excited to see Mother, and that they were affectionate with each other. Cooper also said that Mother was very open and receptive to Cooper's parenting advice. Cooper did state that T.D. in particular initially was somewhat hesitant to see Mother but had gotten better over time. Cooper also said that the children were affected by their parents' acrimonious divorce. Cooper had visited Mother's house and had no safety concerns if the children were to stay with her.

Allison Fields was the DCS caseworker assigned to this case. Fields said that both children had been undergoing counseling and were benefitting from it; however, she also expressly said that she believed that the children would continue receiving counseling and other services even if DCS was not involved and that the parents could afford such services, particularly because the children were covered by Medicaid. Still, Fields believed continued DCS involvement in the case was warranted because of fears that Mother and Father would place the children in the middle of their contentious relationship and divorce. Fields also expressly said that she would have no concerns if the children were to live with Mother. She had no physical safety concerns if the children were to live with Father but had some concerns about Father's animosity toward Mother and saying negative things about her to the children. Fields also noted that the children had learned about the rape accusation Mother had made against Father and that it was inappropriate for them to know about it, but she did not know how the children had learned about it. Fields also discussed the fact that Mother had completed an individual counseling program but Father had not despite DCS's recommendation that he do so.

5

Mother and Father both testified at the second CHINS hearing. By that time, Mother was having unsupervised as well as supervised visitation. Mother agreed that the children were benefitting from the counseling they were receiving that had been arranged through DCS and that they should continue receiving counseling. Mother did not admit that the children were CHINS, however. Father seemed less enthusiastic about DCS's continued involvement in his children's lives but was not opposed to continued counseling.[2]

On February 7, 2014, the trial court entered an order finding that the children were CHINS. The trial court made a limited number of sua sponte findings, related primarily to the children's initial removal from Mother's care in August 2013 and the parties' contentious divorce. The trial court then conducted a dispositional hearing on February 21, 2014. Sometime after the second CHINS hearing and before the dispositional hearing, Father apparently had been charged with raping Mother, based on her previous accusations, and he was in jail awaiting trial. On February 26, 2014, the trial court entered a dispositional order requiring the children to remain in foster care. Father now appeals; Mother has not appealed.

**Analysis**

Father challenges the CHINS determination; he does not directly or separately challenge the dispositional order. When reviewing a trial court's CHINS determination,

---

[2] Included in the volume of exhibits is a report prepared by the guardian ad litem in early November 2013. Although the parties state this report was filed with the trial court, such filing is not indicated in the CCS. Additionally, the report is located in the volume of exhibits after an unrelated document, handwritten by Mother, that was introduced into evidence by DCS at the January 27, 2014 hearing. Mother objected to introduction of that document, which was overruled, and that document was discussed at the CHINS hearing; the guardian ad litem report was not mentioned or discussed. It is unclear to us how or why the report is in the volume of exhibits.

we neither reweigh the evidence nor judge witness credibility. In re S.D., 2 N.E.3d 1283, 1286 (Ind. 2014). Rather, we must consider only the evidence supporting the trial court's decision and the reasonable inferences drawn therefrom. Id. at 1287. The trial court here also entered limited sua sponte findings. Such findings are not required for a CHINS fact-finding order, though they are required for a CHINS dispositional decree. Id. (citing Ind. Code § 31-34-19-10). As to issues covered by the findings, we analyze whether the evidence supports the findings and whether the findings support the judgment. Id. As for issues upon which there are no findings, we review them under the general judgment standard, meaning we will affirm if the judgment can be sustained on any legal theory supported by the evidence. Id.

Although we must, of course, give substantial deference to a trial court's fact-finding role in CHINS cases, we also keep in mind that because "a CHINS adjudication may have long-lasting collateral consequences for [a] family," such an adjudication must be reserved for families who cannot meet a child's needs, "not those who merely have difficulty doing so." Id. at 1285. Because "[e]very CHINS proceeding 'has the potential to interfere with the rights of parents in the upbringing of their children,'" we must ensure that a CHINS determination has not unduly interfered with those rights. In re K.D., 962 N.E.2d 1249, 1258 (Ind. 2012) (quoting In re N.E., 919 N.E.2d 102, 108 (Ind. 2010)). "'[F]orcing unnecessary requirements upon parents whose children have been adjudicated as CHINS could set them up for failure with the end result being not only a failure to achieve the goal of reunification, but potentially, the termination of parental rights.'" Id. (quoting A.C. v. Marion County Dep't of Child Servs., 905 N.E.2d 456, 464-65 (Ind. Ct.

7

App. 2009) (citing I.C. § 31-34-16-4)). Additionally, in making a CHINS determination, a trial court should consider the family's condition not just when the case was filed, but also when it is heard. S.D., 2 N.E.3d at 1290.

There are a number of grounds in Indiana Code Chapter 31-34-1 upon which a child may be found to be a CHINS. The DCS here specifically alleged that the children were CHINS under Indiana Code Section 31-34-1-1, which states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Our supreme court has paraphrased a "CHINS 1" finding under this statute as requiring three basic elements: "that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." Id. at 1287. "Not every endangered child is a child in need of services, permitting the State's parens patriae intrusion into the ordinarily private sphere of the family." Id. The State bears the burden of proving the elements of a CHINS action by a preponderance of the evidence. K.D., 962 N.E.2d at 1253.

We also note that, although the CHINS petition made no allegations regarding

8

Father, "a separate analysis as to each parent is not required in the CHINS determination stage." N.E., 919 N.E.2d at 106. Because the purpose of a CHINS adjudication is to protect children and their best interests, not to punish parents, one parent's conduct can be enough to support such an adjudication. Id. However, each parent has a right to challenge DCS's proof as to whether his or her child is a CHINS. K.D., 962 N.E.2d at 1254. Even if one parent admits to a CHINS determination, such admission is not automatically binding on the other parent, who may demand a fact-finding hearing despite the other parent's admission. See id. at 1256-57. Here, Mother did not admit to the allegations in the CHINS petition, nor did she concede that the children were CHINS, even if she agreed that they were benefitting from counseling obtained through DCS. It is true that Mother has not challenged the CHINS finding on appeal. Still, under the circumstances, we do not believe this affects Father's ability to challenge the CHINS finding on his own.

Regarding the trial court's limited findings in this case, it made several findings related to events in July or early August 2013, such as the discovery of K2 in Mother's residence, physical abuse by Mother against the children, attempts to run away from home by the children, and Father's arrest for invasion of privacy. The trial court also noted the "extremely strained" relationship of Mother and Father and that they had "placed the children in the middle of their contentious relationship." App. pp. 119-20. The trial court also noted that Ti.D. had some continuing emotional issues, such as hoarding and hitting herself when stressed, and that both children would benefit from continued counseling and related services. As noted by DCS, Father does not directly challenge any of these findings. These findings do not specifically address any of the three "CHINS 1" elements: that the

9

parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and that those needs are unlikely to be met without State coercion. See S.D., 2 N.E.3d at 1287. There is no requirement that a trial court make such findings sua sponte. Id. at 1288.[3]

We acknowledge the evidence here that for the most part, both Mother and Father have been cooperative with DCS during the pendency of this CHINS case. Still, DCS legitimately expressed concern that without its ongoing involvement, the children will continue to be caught in the middle of Mother and Father's acrimonious relationship. Indeed, the evidence most favorable to the trial court's ruling is that the relationship was poised only to become even more acrimonious. It is undisputed that shortly after the CHINS order and before the dispositional order, Father was criminally charged with raping and sexually assaulting Mother. At the time of the dispositional hearing he was incarcerated as a result of the charges. It is reasonable to presume that such charges, of which the children had somehow become aware, and the legal proceedings to follow can only have a substantial negative impact on the children, as well as each parent's ability to care for the children's needs. Also, such charges, pitting Mother against Father, place the level of discord in this family well above that which may be found in a more "typical" acrimonious divorce. Keeping in mind our standard of review and that we cannot reweigh the evidence, we conclude there is sufficient evidence that the children are CHINS because they are seriously endangered, their needs are unmet, and their needs are unlikely to be met

---

[3] It is helpful for a trial court to make such findings if there is any evidence to support them. See S.D., 2 N.E.3d at 1288.

10

without DCS involvement or State intervention.

## Conclusion

We affirm the determination that T.D. and Ti.D. are CHINS.

Affirmed.

BRADFORD, J., and BROWN, J., concur.