## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 10 2017, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Victoria L. Bailey
Marion County Public Defender
Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of R.J., A Minor Child, A Child In Need Of Services, <br><br> S.E., <br><br> *Appellant-Respondent*, <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner*. | October 10, 2017 <br><br> Court of Appeals Case No. 49A05-1702-JC-246 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Danielle Gaughan, Magistrate <br><br> Trial Court Cause No. 49D09-1403-JC-517 |

**Brown, Judge.**

[1] S.E. ("Father") appeals from the trial court's modification of the dispositional decree in this child in need of services ("CHINS") case. Father raises one issue which we revise and restate as whether the trial court's modification of the dispositional decree was clearly erroneous. We affirm.

## Facts and Procedural History

[2] On March 19, 2014, the Office of the Department of Child Services of Marion County, Indiana ("DCS") filed a CHINS petition regarding R.J., born on December 25, 2006, and her two siblings, (collectively, the "Children") alleging that D.J. ("Mother") failed to provide the Children a safe and secure home free from sexual abuse, that the home was in deplorable conditions, that Mother and her boyfriend abused marijuana in the residence, and that the Children had numerous unexcused tardies from school. The CHINS petition alleged R.J.'s biological father was unknown. On the same day, the court held an Initial/Detention Hearing where it ordered the removal of R.J. from the home and placement in relative care with her maternal aunt.

[3] On April 4, 2014, Mother entered an admission, and the court found R.J. to be a CHINS.[1] That same day, the court granted the oral motion of DCS to amend the original petition and add Father as the alleged father of R.J. The court ordered Father to submit to DNA testing on May 30, 2014, after Father appeared before it asking to establish paternity for R.J. The court received the

---

[1] The court entered a dispositional decree and parental participation order regarding Mother on May 2, 2014.

results on August 8, 2014, and noted that the DNA testing showed Father was R.J.'s biological father.

[4]    On November 14, 2014, the court held a pretrial hearing where Father appeared by teleconference and waived his right to a factfinding hearing. Father is not a resident of Indiana and resides in Ohio. At the pretrial hearing, Father's counsel explained that, "[R.J.] is almost eight years old and up to this point, neither the child or [sic] [Father] knew that there was a relationship there." Transcript at 7. On the same day, the court found R.J. was a CHINS, held a dispositional hearing, and entered a dispositional order and parental participation order as to Father. In the parental participation order, the court instructed Father "to cooperate with the Department of Child Services in Indiana and Ohio regarding the [Interstate Compact on the Placement of Children ("ICPC")] process." Appellant's Appendix Volume III at 116.

[5]    On December 31, 2014, DCS filed a progress report with the court covering the period from September 26, 2014, to January 9, 2015, and related in part that the family case manager "has had no contact with [Father] and his whereabouts are unknown at this time." Appellant's Appendix Volume II at 231. The court held a periodic review hearing on January 9, 2015, where Father's counsel, according to the Order Regarding CHINS Periodic Review Hearing of the same day, requested that DCS explore the placement of R.J. with Father. At the hearing, Father stated he had been "contacted by Children Services of Ohio . . . for ICPC," counsel for Father stated that visits had been "authorized months ago," and Father stated he did not "know who my daughter [was] really with

until today." Transcript at 23-24, 28. Counsel for DCS stated the "Case Manager reports that it was her impression that [Father] was aware that he needed to contact the relative care giver" and that DCS did not need to arrange the referral for him, and requested the court authorize supervised visits, "but don't order them and . . . we have a lot of service providers in place that can make sure that that's in [R.J.'s] best interest in light of her mental health needs." *Id.* at 25. In the January 9, 2015 Order Regarding Children In Need of Services Period Review Hearing, the court stated that DCS "object[ed] to immediate placement" of R.J. with Father and found that Father "has not complied with [the Children's] case plan." Appellant's Appendix Volume III at 237-238.

[6] On March 9, 2015, DCS filed a progress report covering the period from January 9, 2015, to March 13, 2015, and related again in part that the family case manager "has no contact with [Father] and his whereabouts are unknown at this time." *Id.* at 246. On March 13, 2015, the court held a permanency hearing regarding the report. Father did not appear, and his counsel, when prompted by the court, stated "[n]othing to add." Transcript at 40.

[7] On May 19, 2015, DCS filed a progress report covering the period from March 13, 2015 to May 22, 2015, related again in part that the family case manager "has no contact with [Father] and his whereabouts are unknown at this time," and requested that the permanency plan for R.J. be changed to adoption. Appellant's Appendix Volume III at 13. Three days later, the court held a permanency hearing pertaining to the progress report and recommendation,

and counsel for DCS presented the permanency plan recommendation and stated, "it's very much in their best interest at this point for the plan to change to adoption for [the Children] . . . . The fathers, none of them are involved or participating in any services at this point." Transcript at 45. In its May 22, 2015 Order Regarding CHINS Permanency Hearing, the court found the "proposed permanency plan by DCS should be approved without modification," and the "permanency plan for [R.J.] at this time is adoption." Appellant's Appendix Volume III at 21.

[8] On November 4, 2015, Father filed a motion for supervised therapeutic parenting time at an agency, claiming that "[a]t the direction of DCS, Respondent-Father has attempted to work through the foster parent in order to exercise his parenting time." *Id.* at 37. At the November 30, 2015 hearing on the motion, however, Father's counsel withdrew the motion, stating "DCS has arranged through service providers to allow supervised parenting time between [Father] and [R.J.]." Transcript at 54.

[9] On January 15, 2016, the court held a periodic review hearing. When asked whether another court date had been set in the parallel termination of parental rights ("TPR") proceeding concerning R.J. and Father, counsel for Father responded that he did not believe another date was set and that Father "learned a lot about R.J. that [he did not know] and . . . he's contemplating what his options are." *Id.* at 59. In its Order Regarding CHINS Periodic Review Hearing, the court noted that Mother had signed adoption consents, that a "meeting has been scheduled as to [Father]," and that DCS had requested that

R.J's portion of the case be set for review in thirty days to "allow the team the opportunity to explore additional services for [Father] and [R.J.]." Appellant's Appendix Volume III at 52.

[10] On February 22, 2016, DCS filed a progress report with the court covering the period from January 15, 2016, to February 26, 2016, and related in part:

> [The family case manager] was asked to put specific services in place for [Father] in order to make reunification efforts for [Father, the family case manager] was asked to put in a referral for a parenting assessment . . . . On 1/14/16, [the family case manager] put the referral in for father to complete a parenting assessment . . . . On 1/22/16, [Father] called [the family case manager] and let [sic] a voice message stated [sic], "He no longer wanted to go through with everything and that we can proceed without him." Also he stated, "I have let my attorney know about this as well." [The family case manager] reached out to the appropriate individuals to let them know about this decision. [Father] was not answering phone calls from his attorney and [the family case manager] was asked to try to reach out to him. [The family case manager] was able to speak to [Father] on the phone and [Father] stated he would call his attorney. On 2/3/16, [Father] called the [the family case manager] and stated he now wanted to go through with the process and he wants his daughter back.

*Id.* at 59-60. In the February 26, 2016 Periodic Review Hearing, DCS's counsel explained that Father did complete the parenting assessment, and although the formal results were not back,

> based on the feedback from that assessor, it looks like there may be some ongoing recommendations for mental health as well as substance abuse, but we'll get the formal report back . . . and at

that point, I'll let you know so that [Father] knows what he needs to be doing.

Transcript at 63.

[11]  In its May 2, 2016 progress report, DCS indicated that Father started the parenting assessment on February 22, 2016, completed it at some point during March of 2016, and that as "a result of the assessment, [Father] was recommended to participate in home-based therapy, complete a psychological and anger management assessment, participate in father engagement, and engage in therapeutic visitation."[2]  Appellant's Appendix Volume III at 68.  The report further provided that, during this time period, the family case manager contacted children services in Ohio and obtained a list of agencies used in Ohio to accommodate the services recommended; that on April 13, the family case manager contacted Father to give him a list of agencies, the family case manager went over the information for each agency, Father selected appropriate agencies, and the family case manager gave him the information for each agency; that Father was asked to schedule his appointment for the psychological and anger management assessment and to register for the father engagement program; and that the family case manager emailed Father a release of information form, and asked him to fill out the form for each service and send it back so that the family case manager could gain access to Father's engagement.

---

[2] In its August 2, 2016 progress report, DCS recommended the same ongoing services.

[12] DCS filed an August 2, 2016 progress report providing that the family case manager facilitated a child and family team meeting at Father's residence with Father on May 9, 2016, in Columbus, Ohio. According to the report, Father reported his frustration to the team and that he did not understand why he had to participate in all of the recommended services, and the family case manager explained that "the recommended services are to help address ongoing concerns mentioned in the parenting assessment" as well as to help Father have R.J. in his care. *Id.* at 83. The report also stated that the family case manager mailed Father a certified follow-up letter in May to summarize the meeting and review the information which he was required to return by June 3, 2016, including but not limited to DCS releases signed by any and all workers providing services to Father, documentation of the psychological assessment and recommendations, scheduling and documentation of the anger management assessment and recommendations, and documentation of father engagement attendance and participation.[3]

[13] The progress report further provided that, on July 16, 2016, the family case manager contacted SouthEast Clinic to obtain information of Father's service providers. The family case manager was "unable to confirm what services were being completed or address the providers to give them an understanding of what is going on with the case." *Id.* at 84. According to the progress report, Father was "apparently doing services," but "was not communicating with the

---

[3] Father signed receipt of the certified letter on May 19, 2016.

[family case manager], as requested multiple times."[4] *Id.* at 84-85. During this time, the family case manager was unable to speak with the providers and explain why DCS was involved or why the services were being put into place, was unable to share the results of the parenting assessment appropriately without releases, and still did not know if Father was engaged in services relevant to the case. The report stated that "due to this, there was no progress made to move forward with setting up therapeutic visitation." *Id.* at 84. The progress report also relates that on the same day, Father called the family case manager and stated he "wanted to sign his rights and he was tired of the process" and "he was tired of crying and done with DCS." *Id.* A second voicemail message stated he "wanted to sign his rights away," "he did not want the [family case manager] to call back [sic] him back because it was not

---

[4] The August 2, 2016 DCS progress report stated that the family case manager obtained the following information:

> Therapy: [Father] has been attending group therapy and was reportedly last there on 6/29/16. Whitney Peters was leading the group. [Family case manager] sent an email to her confirming if [Father] was participating in group or not and as of 7/29/16, no response was given.
> Psychological Assessment: [Father] reported he completed this assessment on 5/5/16 and it was conducted by Angela Conley. [Family case manager] sent an email confirming if she conducted his psychological assessment and as of 7/29/16, no response was given.
> On 7/19/16, [family case manager] received a fax from [Father] with a certificate of completion for counseling, dated 6/19/16.
> On 7/25/16, [family case manager] received a phone call from Stephen Baldauf, person who handles Medical Records from SouthEast Clinic. Mr. Balduf [sic] indicated he was given permission by [Father] to release records. The information only indicated [Father] had been participating in anger management since the beginning of June 2016.

Appellant's Appendix Volume III at 84.

necessary," and "the [family case manager] knew his address and to send the paperwork to his home and he promise [sic] it will be returned back." *Id.*

[14] On August 12, 2016, the court held a permanency hearing at which, in response to the request by Father's counsel that DCS be ordered "to set up a visit schedule for [Father] and provide transportation" within thirty days, DCS's counsel stated that

> [t]he team has consistently not recommended [therapeutic parenting time] and continues to not recommend them, including [R.J.]'s therapist, including the [Guardian ad Litem]. This man has never met this child. She has special mental health needs that need to be considered in introducing a new person into her life like this suddenly this late into the case and someone who has not been active in her life in anyway[sic]. So, at this point, DCS would again ask that the court, which you had previously, defer to the child's therapist and to the team and at this point, no one is recommending visits nor have they ever gotten to a place where they felt that the visits would be in the child's best interest.

Transcript at 83. Guardian ad Litem Renee Fishel added that

> [w]e put back in [R.J.'s therapist] so she could start working again with [R.J.], because [Father] was starting to or stated at the Mediation that he wanted to do services. So, it's been referred. He's doing some things. We are getting some information from him, but [R.J.'s therapist] isn't at that place right now to recommend visits start.

*Id.* at 84. In its August 12, 2016 order, the court ruled to "deny [Father's counsel's] request for therapeutic parenting time for [Father] to begin," to "leave my prior order in effect that that would be up to the service providers

including [R.J.]'s therapist as to when and if that should occur and when they're recommending it," and approved without modification DCS's proposed permanency plan for R.J. as adoption. *Id.* at 86. On November 4, 2016, DCS filed a progress report, which relates in part that "DCS respectfully submits that all services for [Father] be discontinued at this time." Appellant's Appendix Volume III at 101.

[15] On December 15, 2016, DCS filed a modification report pursuant to Ind. Code § 31-34-23 that referred to "any Predispositional Report/Progress Report previously filed in this matter . . . for information prior to the dates covered by this report." *Id.* at 105. The report recommended several changes to the plan of care, treatment, rehabilitation or placement of R.J. relating to Father, including that Father "sign any releases necessary for the Family Case Manager to monitor compliance with the terms of the court's order," "submit to random drug/alcohol screens within one hour of request," "complete a psychological evaluation(s) as referred and approved by DCS," "complete an anger management assessment and continue to comply with the ICPC process," and "contact the Family Case Manager every week to allow the Family Case Manager to monitor compliance with this [CHINS] matter." *Id.* at 106-107. On December 21, 2016, DCS filed a Motion to Modify Dispositional Decree.

[16] On January 13, 2017, the court held a hearing on the motion, and counsel for DCS first requested that the court modify the dispositional decree, stating,

> upon receiving some of those reports, we have now seen the need
> for certain services to be ordered by the court. He is indicating

that he wants to reunify with the child. The plan is adoption, but if he wants to reunify, DCS is here today to ask for the services that need to be in place in order for him to pursue that successfully in our opinion . . . .

Transcript at 89. Next, counsel for DCS recommended the following services: (1) homebased therapy, because "both [Father] and [R.J.] have an extensive trauma history"; (2) random drug screens, because Father "admitted to daily marijuana use" in the assessment that was done at Southeast in Ohio in May of 2016 and "R.J. deserves a home free from substance abuse"; (3) a psychiatric evaluation, because his therapist "indicated he thinks [it] is necessary"; (4) anger management, because it had "been attempted and unsuccessfully completed in the past," and Father "repeatedly in his therapy sessions indicated his issues with anger and in terms of his relationship with [R.J.] and her trauma past"; and (5) Father's Engagement, because "a Father Engagement worker would assist in developing a plan for [R.J.] that's healthy." *Id.* at 89-92. Guardian ad Litem Toby Gill stated that Father acknowledged marijuana use "in March of 2016 at a parenting assessment here in Indianapolis" and later clarified that the "marijuana recognitions occurred first of March and again in, [sic] for a subsequent assessment in Ohio in May." *Id.* at 91.

[17] Guardian ad Litem Gill also stated,

I don't believe the case requires us to order services in order for us to proceed on the termination of parental rights. That's just straight up; however, and one of the reasons we didn't is because [Father] agreed voluntarily to engage in these services. In fact, . . . [after the first TPR] mediation, he did call and say he wanted to

sign consents . . . . He recognized the significant trauma that [R.J.] had gone through . . . . He did say he changed his mind. We gave him a chance to do a parenting assessment. He did the parenting assessment in March and it had significant concerns. [Father] did the psychological assessment. We have the psychological assessment and notes [sic] also significant concerns. That's where we noted daily marijuana use.

*Id.* at 93-94. Father's counsel argued in response,

[t]here is no reason for any of these services. They have no intention of reunifying [Father with R.J.] . . . Well, guess what the statute says. Those services have to be ordered. . . . Now, as far as these services, I don't see why two years later this case, Judge, was filed in March of 2015. . . . I believe this modification petition is late. I don't know how to get services. . . . Our TPR Trial is May 5th. . . . [Father] doesn't have a prayer of getting these services completed.

*Id.* at 109-111. Counsel for DCS answered by stating that the one question before the court was if the "services are rationally supportive," that DCS has "attempted to work with [Father] and try to get services in place as he's indicated that he wants to reunify and have gotten nowhere," and that "at this point, this is an effort to continue to move this case along, because at this point, nothing is happening." *Id.* at 112-113. Family case manager LaQuisha Glasco also testified, sharing that Father had not completed the ICPC.[5]

[18]   The court modified the dispositional decree and entered the following findings:

---

[5] When the court followed up asking Father if Mother ever stopped Father from seeing R.J., Father responded that he "filed for a court date for custody of my child back in 2012, I believe, and that, because I brought that up, that enraged the mother." Transcript at 118.

1. On November 14, 2014 the Court issued a Parental Participation Order for [Father] requiring him to cooperate with the DCS of Indiana and Ohio regarding the ICPC process.
2. [Father] did not fully comply with the ICPC but recommendations for him to participate in services were made.
3. [Father] has waivered at times as to whether he is pursuing reunification with his child and so services have stopped and started. [Father] has indicated repeatedly that he wanted to sign consents.
4. More recently [Father] has indicated that he would like to pursue reunification.
5. [Father] is ordered to submit to random screens as he admitted in March and in May of 2016 to daily marijuana use.
6. [Father] is ordered to complete a psychiatric evaluation as a psychiatric evaluation has been recommended by his current therapist.
7. [Father] is ordered to participate in and successfully complete an Anger Management program as [Father] has acknowledged his issues with anger and those need to be addressed because of [R.J.]'s past trauma history.
8. [Father] is ordered to participate in individual therapy to address his own past trauma history.

Appellant's Appendix Volume II at 37. Additionally, the court issued a modified parental participation decree ordering Father to "sign any necessary releases," "submit to random drug/alcohol screens," "meet with medical/psychiatric personnel, as directed by the medical/psychiatric personnel," that Father's "therapist is authorized to communicate with [R.J]'s therapist" and "to sign releases of information," "to participate and successfully complete an Anger Management program, and follow all recommendations,"

and "become engaged in individual therapy referred by the Family Case Manager and follow all recommendations." Appellant's Appendix Volume III at 132.

## *Discussion*

[19] The issue is whether the trial court's modification of the dispositional decree was clearly erroneous. When reviewing a modification of a dispositional decree "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *In re T.S.*, 906 N.E.2d 801, 804 (Ind. 2009) (citing Ind. Trial Rule 52). When the trial court enters findings of fact, the appellate court applies a two-tiered standard of review "considering first whether the evidence supports the findings and then whether the findings support the judgment." *Id.*; *see also In re A.C.*, 905 N.E.2d 456, 461 (Ind. Ct. App. 2009) (citing *Parmeter v. Cass County Dep't. of Child Servs.*, 878 N.E.2d 444, 450 (Ind. Ct. App. 2007)). Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *In re T.S.*, 906 N.E.2d at 804 (citing *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the resulting judgment. *Id.* We give due regard to the juvenile court's ability to assess witness credibility and do not reweigh the evidence, instead considering the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *In re A.C.*, 905 N.E.2d at 461 (citing *Parmeter*, 878 N.E.2d at 450).

[20] Father argues that there was no evidence presented at the hearing on DCS's Motion to Modify to support the court's new parental participation decree. Citing *In re A.C.*, 905 N.E.2d 456, he argues that a trial court must base its decision regarding disposition on admitted evidence rather than the arguments of counsel and that, at the hearing, neither party admitted evidence upon which the trial court could base its decision, specifically that DCS called no witnesses and did not move to admit any exhibits and that the Guardian Ad Litem called no witnesses and never admitted into evidence its sole exhibit.

[21] DCS argues the modification of the dispositional decree was not clearly erroneous given Father's failure to comply with the ICPC, recommendations from his parenting assessments, and R.J.'s prior exposure to drug use. Specifically, DCS argues that Father disregards the evidence that came in through the modification report and the progress reports which it incorporates; that modification hearings are like dispositional hearings and unlike formal evidentiary hearings and, thus, the trial court may consider any evidence of probative value even if it would otherwise be excluded under rules of evidence; and that the "court ordered services were necessary in order to ensure that Father was participating in the services recommended to him in the parenting assessment so that he could work towards reunification with Child." Appellee's Brief at 15.

[22] DCS's authority to request a modification of the dispositional decree is governed by Ind. Code § 31-34-23-1(2)(C), which provides that "[w]hile the juvenile court retains jurisdiction under IC 31-30-2, the juvenile court may

modify any dispositional decree: . . . upon the motion of . . . the attorney for the department [of Child Services] . . . ."  As the Indiana Supreme Court further explained in *In re T.S.*, 906 N.E.2d at 803,

> section 31-34-23-3(b) requires the juvenile court to hold a hearing on such request, and section 31-34-23-4 provides that section 31-34-19 "appl[ies] to the preparation and use of a modification report" and that DCS shall prepare a report in such a hearing. What may have originally begun as a periodic review became a modification hearing on the juvenile court's initial order of disposition.

At the time when the case here was being tried, as well as at the time when this court decided *In re A.C.*, 905 N.E.2d 456, Ind. Code § 31-34-20-3 provided in part that:

> If the juvenile court determines that a parent, guardian, or custodian should participate in a program of care, treatment, or rehabilitation for the child, the court may order the parent, guardian, or custodian to do the following:
>     (1) Obtain assistance in fulfilling the obligations as a parent, guardian, or custodian.
>     (2) Provide specified care, treatment, or supervision for the child.
>     (3) Work with a person providing care, treatment, or rehabilitation for the child.
>     (4) Participate in a program operated by or through the department of correction.

(Subsequently amended by Pub. L. No. 183-2017 (eff. July 1, 2017).

[23]    In *In re A.C.*, a mother argued that there was insufficient evidence to support the juvenile court's participation decree ordering her to participate in and

successfully complete a drug and alcohol assessment, including intensive outpatient treatment or inpatient treatment as recommended by evaluations. 905 N.E.2d at 464-465.  In its decision, the court cited Ind. Code § 31-34-20-3 and held that, "[a]lthough the juvenile court has broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstance that was revealed by the evidence." *Id.* at 464.  The court observed that the juvenile court found that the mother "agreed that she needed the services being proposed by the [DCS] but disagreed that she needed any substance evaluation services" and there was no other reference to any alleged substance abuse in the findings of fact or conclusions of law. *Id.*  The court stated: "In addition, after reviewing the record, we are unable to find any allegation or even an indication that [the mother] has a substance abuse problem." *Id.*  The court concluded that the evidence did not support the juvenile court's participation decree requiring the mother to submit to a drug and alcohol assessment, random drug testing, and substance abuse treatment. *Id.*

[24]    Here, unlike in *A.C.*, the record reveals that the requirements of the modified participation decree relate to the behavior and circumstances revealed by the evidence.  Both parties agree that the juvenile court is able to admit the dispositional report of DCS at a dispositional hearing, even if the report includes hearsay. *See In re K.D.*, 962 N.E.2d 1249, 1259 (Ind. 2012) (citing *In re C.B.*, 865 N.E.2d 1068, 1072 (Ind. Ct. App. 2007)).  Hearsay is "admissible in dispositional hearings, and subsequent hearings to modify a disposition,

because '[e]xcluding hearsay evidence . . . would in many cases disserve the child by excluding relevant information that might support a less restrictive disposition.'" *N.L. v. State*, 989 N.E.2d 773, 779 (Ind. 2013) (quoting *In re L.J.M.*, 473 N.E.2d 637, 643 (Ind. Ct. App. 1985)). The trial court may consider "evidence of probative value even if the [evidence] would otherwise be excluded." *In re K.D.*, 962 N.E.2d at 1259 (citing Ind. Code § 31-34-19-2(a)); *see also N.L.*, 989 N.E.2d at 779 (citing for the same proposition "I.C. § 31-37-18-2(a) (governing dispositional hearings)" and "I.C. § 31-37-21-3(a) (governing reports prepared for review or modification hearings)").

[25] DCS's December 21, 2016 Motion to Modify Dispositional Decree referenced the modification report filed on December 15, 2016, which in turn referenced any "Predispositional Report/Progress Report previously filed in this matter . . . for information prior to the dates covered by this report." Appellant's Appendix Volume III at 105. As set forth above and in the record, numerous progress reports filed by DCS discuss services ordered with respect to Father. Additionally, the record reveals that, at the January 13, 2017 hearing, the Guardian ad Litem stated that Father "acknowledged [the marijuana use] prior to that in March of 2016 at a parenting assessment here in Indianapolis," and later clarified that the "marijuana recognitions occurred first of March and again in, for a subsequent assessment in Ohio in May." *Id.* at 91. Also, family case manager Glasco stated that Father did not complete the requirement

presented in the original November 14, 2014 parental participation decree.[6] Based upon the record, we conclude that the evidence supports the requirements of the modified participation decree.

### *Conclusion*

For the foregoing reasons, we affirm the trial court's modification of the dispositional decree.

Affirmed.

Najam, J., and Kirsch, J., concur.

---

[6] Progress reports in the record indicate that DCS received no contact from Father for a period of time greater than a year, spanning from September 26, 2014, to November 4, 2015.