# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

**RUTH JOHNSON**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF: A.M.-K. (Minor Child), A CHILD IN NEED OF SERVICES, | ) ) ) | |
| and | ) ) | |
| A.M. (Mother), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 49A02-1207-JC-533 |
| MARION COUNTY DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner, | ) ) | |
| and | ) ) | |
| CHILD ADVOCATES, INC., | ) ) | |
| Appellee-Guardian Ad Litem | ) | |

**February 20, 2013**

**OPINION – FOR PUBLICATION**

**BAKER, Judge**

A.M. (Mother) was involuntarily committed for emergency mental health treatment, and the Indiana Department of Child Services (DCS) filed a petition alleging that each of Mother's two children was a child in need of services (CHINS). The juvenile court determined that A.M.-K. was a CHINS, and Mother was ordered to participate in various services and to abide by the recommendations of mental health professionals, including taking all medications as prescribed.

Mother challenges the propriety of the parental participation order. More particularly, Mother claims that because the DCS failed to file a parental participation petition, the juvenile court lacked the authority to order her participation in any services or treatment. Mother also claims that the order directing her to take any medications as prescribed violates her constitutional right to decide her own mental health treatment.

We conclude that Mother was adequately notified of the DCS's recommended plan of participation and that Mother acquiesced to the trial court's authority to enter a parental participation order. However, we also conclude that the DCS failed to present

2

sufficient evidence to overcome Mother's liberty interest in deciding her own treatment when Mother objected to the order and presented evidence of her concerns. Accordingly, we affirm in part, reverse in part, and remand for additional proceedings consistent with this opinion.

## FACTS

In September 2011, Mother was staying at a hotel in Indianapolis with her nine-year-old daughter S.M. when she decided to go swimming in a nearby creek. Mother left S.M. with the hotel's owner, whom Mother knew, and walked to the creek, stripped down until she was naked, and swam until she suffered a stomach cramp and had to get out. Someone observed Mother lying in the grass naked and called the police.

When Officer Steven Jones from the Indianapolis Metropolitan Police Department (IMPD) arrived, he located Mother behind the hotel "sitting completely nude on the sidewalk." Tr. p. 56. Officer Jones asked Mother why she was not wearing any clothes, and she replied that "she wanted to be nude and she was allowed to be nude." Id. Although Mother initially refused to find her clothes, she allowed herself to be covered with a blanket and eventually got dressed. Officer Jones became concerned for Mother's mental health when he observed that Mother was demonstrating odd behavior, such as "emotional swings from . . . crazed laughter to yelling into the sky . . . 'in the name of Jesus Christ I have seen the light.'" Id. Officer Jones detained Mother to take her to a hospital for mental health evaluation and treatment.

3

DCS family case manager Amy Ryan (FCM Ryan) also responded to the scene after the DCS received a report that S.M. "was left alone in a hotel room while [Mother] . . . swam in a drainage ditch naked." Id. at 66. When FCM Ryan arrived, Mother was already dressed, and S.M. was sitting in the back of a police vehicle. S.M. "looked scared" and asked FCM Ryan "why her mom was crazy." Id. at 72. Mother told FCM Ryan that she had removed her children from school to come to Indianapolis "for a natural healing experience." Id. at 67. She stated that she left six-year-old A.M.-K. with his father "a few weeks prior to [the incident]." Id. Mother also admitted to having attempted suicide in September 2009 by overdosing on prescription medications and alcohol. As a result of Mother's suicide attempt in 2009, S.M. had previously been adjudicated a CHINS, but the case closed in approximately March 2010.

When FCM Ryan asked Mother about any current drug use, Mother replied, "I am clean from my sin and what I did is within." Tr. p. 67. FCM Ryan also discussed Mother's mental health treatment to that point. Mother told FCM Ryan that she had been diagnosed with "post-traumatic stress disorder, a pseudo seizure disease and a neuro cardio disease." Id. at 68. Mother also told FCM Ryan that she "had stopped taking her medication a week ago." Id. However, Mother did not indicate what disease that medication had been prescribed to treat.

FCM Ryan substantiated the allegation of neglect as to Mother because "[S.M.] was left alone in the hotel room and . . . [Mother] was admitted to [a] psychiatric facility,

4

[leaving] no one to care for [S.M. and A.M.-K.] at the time" and due to "concerns about [Mother's] mental health and her ability to care for the children." Id. at 68-69.

Mother was involuntarily committed for mental health treatment for several weeks. She was diagnosed with bipolar disorder and prescribed lithium. However, Mother was taken off the lithium and prescribed Geodon because the lithium had elevated her blood pressure and caused an episode with Mother's heart condition. However, upon Mother's discharge from commitment, Mother's primary care physician, Dr. Charlie Williams, took her off the Geodon and told her to schedule a follow-up appointment in a year. Mother claimed that she also had "a bad allergic reaction" to the Geodon and that it "made [her] very sick . . . to where [she] couldn't sleep and where [her] heart was puttering." Tr. p. 142-43.

Once she was discharged, Mother began having supervised parenting time with her children, but her parenting time was suspended in December 2011. Prior to the suspension of her parenting time, Mother had asked that she be permitted to see her children individually instead of together. In March 2012, Mother participated in a psychological evaluation, which recommended in part that Mother participate in a psychiatric evaluation to determine if she would benefit from anti-psychotic medication.[1] Mother also began individual counseling with Tatenda Mandaza, a home-based therapist referred by the DCS.

---

[1] Mother may have been diagnosed with schizophrenia as a result of the psychological evaluation.

5

A fact-finding hearing on the CHINS petition was held over two days in April and May 2012.[2]  At the hearing in April, Mandaza testified that Mother had experienced "minimal progress" in therapy.  Tr. p. 75.  Mandaza noted that Mother's "thinking patterns sometimes tend to be egocentric and . . . it was hard for her to differentiate what was best for her children and what she wanted."  Id. at 83.  Mother would also become "overwhelmed" regarding the need to discipline both children during visits.  Id.  Mandaza recommended that Mother continue therapy and participate in a psychiatric evaluation.  Mandaza recommended the evaluation because Mother had been "diagnosed with different variations of a psychotic disorder by more than one professional"[3] and because "research shows that medication sometimes is helpful in treatment."  Id. at 76.  Mandaza further stated her belief that "at this point . . . therapy alone is not going to be as effective."  Id. at 78.

A.M.-K.'s stepmother testified that she had previously observed Mother acting "not all there" once when Mother and S.M. dropped off items at her home for A.M.-K.  Id. at 92.  More specifically, Mother talked to herself and repeatedly said, "I'm just doing what God's asking me to do."  Id.  Mother also told the stepmother that "when she gets in the car she just does what God tells her to and closes her eyes and she automatically gets to her destination somehow."  Id. at 93.  Additionally, Mother threatened to jump off the balcony, and she and S.M. left after Mother was convinced to come inside.  However, a

[2] The juvenile court also heard evidence on the custody modification petition that S.M.'s father had filed.
[3] Mother told Mandaza that she had been "misdiagnosed with schizophrenia."  Tr. p. 84.  Mandaza also learned through documentation provided to her from the DCS that Mother had been diagnosed "as bipolar with psychotic features."  Tr. p. 84.

6

few minutes later, A.M.-K.'s stepmother overheard Mother and S.M. talking outside, and S.M. told Mother she was hungry. In response, Mother "gave [S.M.] some wood pieces, . . . and she asked her to chew on it." Id. When S.M. refused, Mother chased S.M. around the yard to try to get her to chew on the wood pieces.

Mother disagreed with the bipolar diagnosis, claiming that she was only diagnosed with a psychiatric condition "because [she] told a doctor who did not have [her] same religious beliefs that [she] believed in God." Tr. p. 140. Mother also consistently stated that she is "unwilling" to get a psychiatric evaluation because the "sole purpose of seeing a psychiatrist" is for a prescription. Id. at 17, 77. Mother believes that taking medications is "against [her] religion" and that the medications could produce side effects that interfere with her heart condition. Id. at 17. And although Mother testified in April that she would participate in "any type of therapy" and that she had already been seeing another therapist weekly prior to the commencement of the CHINS case because she had been experiencing pseudo seizures, Mandaza testified that Mother "vacillates between wanting to participate and . . . saying that she doesn't want to see [Mandaza] again or would not like to be involved in services." Id. at 17, 77. Moreover, at the May fact-finding hearing on the CHINS petition, Mother's therapy with Mandaza had been discontinued, and Mother was resistant to continuing further therapy.

After the conclusion of the fact-finding hearing, the juvenile court found that A.M.-K. was a CHINS but modified custody for S.M. to her father and consequently found that S.M. was not a CHINS. A dispositional hearing was held on the CHINS case

7

on June 13, 2012. Prior to the dispositional hearing, the DCS submitted a pre-dispositional report but failed to submit a parental participation petition as to Mother.[4] Nevertheless, at the hearing, the DCS recommended that Mother participate in a number of services, including a psychiatric evaluation, that Mother follow all recommendations from that evaluation, and that Mother meet all of her personal, medical, and mental health needs, including taking prescription medications as prescribed. The Guardian Ad Litem concurred in these recommendations.

Mother raised no objections to most of the DCS's recommendations, but she specifically objected to the provision directing her to take all medications as prescribed. In response, the juvenile court stated:

> I found the child to be a child in need of services. . . . [Q]uite a bit of the fact-finding was about your mental health issues. . . . I quite frankly find there's a rational basis for a psychological evaluation and psychiatric exam and if they order medication, they order medication. Now, am I coming to your house and forcing it down your throat? No, I'm not.

Tr. p. 167. The juvenile court then ordered Mother to comply with the DCS's recommended plan of participation in its entirety. Mother now appeals.

DISCUSSION AND DECISION

We first observe that Mother is not challenging the juvenile court's determination that A.M.-K. is a CHINS. Rather, Mother only challenges the authority of the juvenile court to enter a parental participation order generally when the DCS failed to file a

___

[4] The DCS had previously submitted a parental participation petition with regard to A.M.-K.'s father.

parental participation petition and specifically one that directs Mother to take any medications as prescribed.

## I. Failure to File Parental Participation Petition

We first examine Mother's contention that because the DCS failed to submit a parental participation petition prior to the dispositional hearing, the trial court was without authority to enter a parental participation order at all. Indiana Code section 31-34-16-3 provides:

> A petition seeking participation of a parent, guardian, or custodian must be entitled "In the Matter of the Participation of _____ the Parent, Guardian, or Custodian of _____." The petition must allege the following:
>
> (1) That the respondent is the child's parent, guardian, or custodian.
>
> (2) That the child has been adjudicated a child in need of services.
>
> (3) That the parent, guardian, or custodian should:
>
>> (A) obtain assistance in fulfilling obligations as a parent, guardian, or custodian;
>>
>> (B) provide specified care, treatment, or supervision for the child;
>>
>> (C) work with a person providing care, treatment, or rehabilitation for the child; or
>>
>> (D) refrain from direct or indirect contact with the child.

Once such a petition is filed, the juvenile court is to hold a hearing on the petition concurrently with either a dispositional hearing or a hearing to modify the dispositional decree. Ind. Code § 31-34-16-4. One of the purposes of a dispositional hearing is to

9

consider "the necessity, nature, and extent of the participation by a parent, a guardian, or a custodian in the program of care, treatment, or rehabilitation of the child." I.C. § 31-34-19-1(a)(2).

As Mother suggests, a few cases from different panels of this Court have held that the filing of a parental participation petition is jurisdictional and that, without it, the juvenile court has no authority to order parental action. See, e.g., Mikel v. Elkhart Cnty. Dep't of Public Welfare, 622 N.E.2d 225, 229 (Ind. Ct. App. 1993); In re M.R., 934 N.E.2d 1253, 1256 (Ind. Ct. App. 2010). However, we find these cases distinguishable from the present case.

In Mikel, this Court reversed a juvenile court's finding that a father was in contempt for failing to abide by previous orders of the juvenile court entered at the initial hearing and at the time the children were adjudicated as CHINS. 622 N.E.2d at 229. A separate dispositional hearing was not held. Brief of Appellant at 9, Mikel v. Elkhart Cnty. Dep't of Public Welfare, 934 N.E.2d 1253 (1993) (No. 20A03-9303-CV-105). And in M.R., we vacated a parental participation order as to an alleged father in part because a parental participation petition had not been filed but also because the man had not yet been adjudicated as a parent to one of the children involved in the CHINS proceedings. 934 N.E.2d at 1255-56.

In the instant case, although the DCS failed to file a formal parental participation petition as described in Indiana Code section 31-34-16-3, it did file a predispositional report that included all of its recommendations for the proposed plan of care, treatment,

10

rehabilitation, and placement of A.M.-K. Appellant's App. p. 146-47. The predispositional report also summarized these recommendations for how Mother should obtain assistance in fulfilling her obligations as a parent, guardian, or custodian and explained why such assistance was necessary. Id. at 147. The DCS family case manager who prepared the predispositional report was present at the dispositional hearing and available for cross-examination about the recommendations contained within the report. Tr. p. 163. Finally, Mother specifically agreed to almost all of the recommendations, objecting only to the provision of one of the recommendations that required Mother to take any medications as prescribed. Id. at 164-65.

Based on these circumstances, we cannot say that the juvenile court erred when it entered the parental participation order. It appears that the DCS's predispositional report, although it did not have the statutorily-required title for a parental participation petition, nonetheless substantially complied with the requirements of Indiana Code section 31-34-16-3. Additionally, Mother acquiesced in the procedures utilized by the juvenile court in ordering her to complete various services and treatments. Thus, we conclude that the DCS's failure to file a parental participation petition does not require that we vacate the participation order in this case.

## II. The Order to Take Medications as Prescribed

Mother next contends that the juvenile court's order that she take all medications as prescribed violates her constitutional right to direct her own medical treatment. Indeed, our Supreme Court has recognized that competent adults are entitled to make

11

informed decisions about their medical care and that of their children. In re Lawrance, 579 N.E.2d 32, 38-39 (Ind. 1991). However, this right is not without limitation. For example, a parent may not refuse life-saving treatment for one's child, and a court may order that an adult be compelled to take medications in certain instances. See Schmidt v. Mut. Hosp. Servs., Inc., 832 N.E.2d 977, 981-82 (Ind. 2005) (recognizing that parents can generally refuse their own medical treatment but cannot make martyrs out of their children); In re Mental Commitment of M.P., 510 N.E.2d 645, 647-48 (setting out the requirements for a forced medication order in an involuntary commitment case).[5]

A juvenile court generally has broad discretion in determining the programs and services in which a parent should participate in order to pursue reunification with the parent's child. In re A.C., 905 N.E.2d 456, 464 (Ind. Ct. App. 2009). Nevertheless, we have held that "the requirements must relate to some behavior or circumstance that was revealed by the evidence." Id. For the vast majority of provisions in parental participation orders, this is all that is required. However, where, as here, a parent objects to an order directing the parent to take all medications as prescribed and presents

---

[5] To obtain a forced medication order in an involuntary commitment case, the State must prove by clear and convincing evidence that:

> 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medication will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient.

M.P., 510 N.E.2d at 647. Moreover, the trial court must determine that the treating physician has evaluated and rejected every alternative form of treatment because no less restrictive treatment exists and that the proposed treatment is reasonably related to the reason for the individual's commitment. Id. at 647-48. Finally, the order may not be indefinite. Id. at 648.

evidence of side effects and religious beliefs supporting that objection, we believe that additional evidence is necessary to overcome the parent's constitutionally protected liberty interest in remaining free of unwarranted intrusions into the mind and body.  See M.P., 510 N.E.2d at 646.

In the instant case, the evidence demonstrated that Mother suffers from serious mental health issues for which she has received various diagnoses and that, as a result, A.M.-K. was a CHINS.  Tr. p. 38, 68, 87; Appellant's App. p. 135-39.  However, Mother offered uncontradicted evidence that the anti-psychotic medications she was prescribed had serious side effects that interfered with her heart condition, and she also raised a religious objection to the medications.  Tr. p. 142, 165, 168, 173.  On the other hand, the DCS presented no testimony from a psychiatrist that suggested, let alone proved, that an order directing Mother to take any particular medication was necessary in order for Mother to be stable enough to adequately parent A.M.-K.

The consequences for failing to abide by a parental participation order are indeed harsh; such a failure could potentially lead to the termination of Mother's parental rights. A.C., 905 N.E.2d at 464-65.  In light of the possible consequences and Mother's protected liberty interest in directing her own mental health treatment, we cannot say that the DCS presented sufficient evidence to support the trial court's order with regard to Mother taking all medications as prescribed.  Moreover, we believe that there is an inherent problem where, as here, the parental participation order does not direct Mother to take a specifically recommended medication on the basis of a doctor's evaluation of

13

Mother's mental health but requires Mother to take any and all medications without regard to her objections and the possible side effects.

That being said, we also conclude that the DCS presented sufficient evidence to support the juvenile court's remaining orders, including the requirement that Mother participate in a psychiatric evaluation. Such an evaluation does not raise the same constitutional concerns as an order to take all medications as prescribed, and we find that this order was reasonably related to the evidence presented at the fact-finding and dispositional hearings. And once such an evaluation takes place, the DCS may well have sufficient information to move for a modification of the dispositional order to require that Mother take specifically recommended medications deemed necessary at that time for her reunification with A.M.-K.

The judgment of the juvenile court is affirmed in part, reversed in part, and remanded.

RILEY, J., and BARNES, J., concur.

14