## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 24 2016, 9:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT S.D.

Paula M. Sauer
Danville, Indiana

ATTORNEY FOR APPELLANT KE.D.

Brian J. Johnson
Danville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: K.D., a Child in Need of Services,

S.D. (Mother) and Ke.D. (Father),

*Appellants-Respondents*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner*.

May 24, 2016

Court of Appeals Case No. 32A05-1510-JC-1724

Appeal from the Hendricks Superior Court

The Honorable Karen M. Love, Judge

Cause No. 32D03-1505-JC-40

**Bradford, Judge.**

# Case Summary

S.D. ("Mother") and Ke.D. ("Father") (collectively, "the Parents") appeal from the juvenile court's adjudication that K.D. ("Child") is a child in need of services ("CHINS"). Mother, Father, Child, and Child's three older siblings—Ke'T.D., Ke'S.D., and H.D.—live together in Avon. In April of 2015, the Hendricks County Department of Child Services ("DCS") received a report that Father had physically abused Child, then six years old, in the home Father and Mother shared with Child and their other three children ("the Home").

DCS petitioned the juvenile court to adjudicate Child a CHINS. During the CHINS proceeding, Father admitted that he had hit Child twice in the head as punishment for missing his school bus but expressed no remorse and denied that he had done anything wrong. Mother also indicated that she believed Father had done nothing wrong. The juvenile court adjudicated Child a CHINS, ordered that Child remain placed with Parents, and issued participation orders for both Parents. Father and Mother both contend that there is insufficient evidence to sustain a finding that Child is a CHINS. Mother also contends that the juvenile court abused its discretion in ordering her to fulfill certain requirements. Because we conclude that the juvenile court did not abuse its discretion, we affirm.

# Facts and Procedural History

[3] On April 29, 2015, DCS became aware of a report that Child, born on August 6, 2008, had a cut on his face and scratches, which Child claimed were caused by Father throwing him against a wall. Family Case Manager Veronica Fritsch ("FCM Fritsch") interviewed Child at school and noticed that he also had a bump on the back of his head. FCM Fritsch, accompanied by a police officer, went to the Home. Father admitted that he had spanked Child on his "bottom" and indicated that the scratch on Child's face could have been caused by his ring. Tr. p. 41. During the visit, Father was "[h]ostile" and "[h]e would puff up his chest [and] get very loud." Tr. p. 42.

[4] On April 30, 2015, Child was examined by a doctor and told the doctor that Father had hit him on the back of the head. FCM Fritsch also visited the Home and spoke with Mother that day. While Father was in the home, Mother did not provide much information, looked down frequently and "would not fully open up." Tr. p. 44. Mother was more willing to talk when Father left, but was not very willing to speak about domestic violence.

[5] On May 11, 2015, DCS filed a petition alleging Child to be a CHINS due to Father's physical abuse. By the end of May of 2015, FCM Kristen Miller had taken over the case, and visited the Home with Guardian Ad Litem Suzanne Conger ("GAL Conger") on June 12, 2015. Father answered the door and, after FCM Miller and GAL Conger interviewed the children, took them on a tour of the Home with Mother. As FCM Miller and GAL Conger were leaving the Home, Father became "intimidating" and "hostile[,]" asked FCM Miller why she had lied in court, and "puffed himself up." Tr. pp. 98, 117.

On July 1, 2015, the juvenile court held an evidentiary hearing. On July 30, the juvenile court issued its order adjudicating Child to be a CHINS, which order provides in part as follows:

12.    Steven Patton is a resident physician at Community Health Network. On 4-30-15 he examined [Child] at an outpatient center in Speedway. Dr. Patton observed an abrasion under his left eye and a contusion on the left side of his head and another contusion on the right side of his head. On the left side the raised bruised area was 2 by 3 centimeters and on the right side the raised bruise was 3 by 4 centimeters.

13.    Mother was with [Child] during the exam. Dr. Patton asked Mother how [Child] got the injuries and Mother did not respond. The doctor then asked [Child] how he got the injuries. [Child] initially said he was lifting weights and he fell and hit his head on some weights, then [Child] said his Father hit him in the back of the head for discipline for missing the bus. Based on the contusion and reason given the doctor decided to do an x-ray to be sure [Child] did not have a skull fracture. The x-ray was within normal limits. Dr. Patton was concerned about a possible brain contusion or brain bruise so he explained to Mother that she needed to watch [Child] for any signs of lethargy, confusion, headache, or muscle weakness and if she observed any signs she needed to call the clinic and let them know.

14.    A contusion is a bruise with swelling.

15.    During Dr. Patton's exam [Child] did tell the doctor that the back of his head hurt.

16.    Dr. Patton did exam the rest of [Child]'s body and did not observe anything else that was abnormal.

17. Dr. Patton noted that it is unusual for a parent of a six year old not to respond when asked how their child was injured.

18. Dr. Patton estimated that [Child]'s injuries would be visible for 3-4 weeks.

19. When [Child] told Dr. Patton that Father hit him in the back of the head [Child] looked at his Mother and said "Mom knows what's going on". Mother just sat there with a sad look on her face.

20. The Court finds Dr. Patton credible and helpful in explaining [Child]'s injuries.

21. Dr. James Williams is employed at Community Westview residency clinic in Speedway as a preceptor faculty member. Dr. Williams has been in family practice for about 40 years. He was supervising Dr. Patton during the exam of [Child] on 5-1-15. Dr. Williams also observed [Child]'s contusion or bruising behind the ears. Court finds Dr. Williams credible and his testimony is consistent with the pictures Ms. Fritsch took of [Child]. The contusions on the back of [Child]'s head would be consistent with a blow to the back of the head or throwing a child into the wall or bed or falling on a weight.

22. Dr. Williams was present during the entire examination. Dr. Williams observed that [Child]'s injuries were consistent with [Child]'s statement that his father hit him. Dr. Williams explained that [Child]'s fall and hitting his head on the weight happened during the incident when Father hit [Child] in the back of the head for missing the bus.

23. [Child] was alert and oriented during the exam. Mother did not offer the doctors any explanation for [Child]'s injuries. She told them she was at work. She did tell them that her father lived with them and her father told her he heard yelling and screaming at the time of the injuries.

25. Angela Hartman is employed at Community Westview Clinic in Speedway…. On 5-1-15 she met with [Child] and Mother. Ms. Hartman asked Mother if she felt safe. Mother would not look at Ms. Hartman and tears welled up in her eyes. Ms. Hartman explained to Mother that it was her responsibility to keep herself safe and to keep her children safe. Mother just looked at Ms. Hartman with tears welling up in her eyes. Ms. Hartman was very concerned. Ms. Hartman has 30 years experience and is on the behavioral faculty at Community Westview Hospital, Speedway Family Practice Clinic.

Mother did not take [Child] to the doctor on her own volition. The clinic knew before the exam that [Child]'s injuries were a CHINS case.

26. Kristin Miller is a family case manager for DCS. She took over the case from Ms. Fritsch in late May early June 2015. Ms. Miller obtained [Child]'s medical records which were admitted as Exhibit 3.

27. Ms. Hartman's note contained in Exhibit 3 states:

"Patient seen in conjunction with his mother, Dr. Patton, pre-ceptor, Dr. Williams, and myself on 4/30/15. Patient is a 6 year old African American male who was seated on the exam table dressed in a patient's gown. He was busy interacting with his mother, who was seated at the end of the table. When asked about his injuries, he was rather elusive, looking at his mother, and asking her to answer. He had already shared the information below with Drs. Patton, and Williams, as well as, the MA, Carla. He engaged readily in answering my question about how he had gotten the raised bump behind his ear, and the soreness of the area behind his other ear, to which he responded that his ""daddy had hit me in the head."". [*sic passim*] He said that ""my head hit the wall, and I hit a weight, near the weight bench."" When asked about whether he has seen his dad hit his mom, he looked at her,

and asked her to answer, ""because she knows"". She became quiet, tears welled up in her eyes, but said nothing, other than assuring her son with ""I am okay"", and … ""I am all right"". Reviewed with her the need to get protection for herself, and/or her children and that it is her responsibility to protect them from harm. She admitted that she too, uses spanking as a form of discipline. She shared that she was not aware of this current situation, because she had been at work.

He went on to say to his mother that she ""is always stressed"", "you know you are, mommy". She asked him why he had not told her about being hit by his daddy? And he said that ""I know that you are stressed"". She said nothing, looking at him the whole time. When asked by myself if she felt safe in the relationship, she looked away, and did not answer. Thanked her for bringing [him] in to meet with the doctors, who remained in the room, and encouraged her to continue to work with DCS, and to keep herself, and her children safe from harm. She signed a medical release for us to share with DCS, and took her son to get an x-ray of his skull, at the x-ray department across the hall."

28.    Dr. Williams['s] note contained in Exhibit 3 states:

"This patient was seen and examined, and discussed with the resident physician. See the resident note for details. I was physically present during key portions of the encounter and I actively participated in the medical decision making. Key History: Alleged physical abuse by child's father with an area of abrasions to the right side of his face from hitting/slapping, and an abrasion to the post auricular area of the head on the left side, and an area of a large contusion with swelling on the right posterior auricular area of the head in the area of the right Mastoid sinus. This measures approximately 4 cms X 3.5 cms.

Key Exam: Dr. Patton and I thoroughly examined 6 y/o male child, [Child], and found him to be very intelligent and alert. He was seen with his mother in the room. She related that she was not home at the time of the alleged abuse.  His exam was unremarkable except for the above mentioned abrasions and contusion of his head.  He had no recent injuries of his extremities and no abrasions or contusions of his buttocks or of the penis/scrotal areas. He was very alert and for a 6 y/o child answered questions appropriately.  He stated that his father had hit him on his face and had thrown him either down on his bed or into the wall.  His posterior auricular head injuries he initially stated were a result of this but then related that the left sided posterior auricular abrasion was from attempting to lift weights although he and also his mother could not explain how this could occur.  Assessment:  1. Physical Abuse by child's biological father with [a]brasions and contusions as described above.

Plan:  1. A thorough physical exam was done and documented by Dr. Patton and myself.  2.  Social Services was made aware and discussed the case thoroughly with both the child and the child's mother.  3. Pictures of the abrasions and the swollen area with a large contusion were taken.  4. A skull x-ray was ordered and done to rule out any bony injury to the posterior or facial areas of the head. 5. Social Services will report findings to Child Protection Agency."

29.   Dr. Patton's note contained in Exhibit 3 states:

"This event happened with the biological father, "they all live in the same house"  CPS became involved due to the school having a concern.  A teacher asked him what happened to his face he told the teacher his father scarred his face after discipline.  They took the child to the office and asked him what happened and they also spoke to one of his siblings that also go to school.  She has a meeting with mother and father basically the plan was to document

proper discipline and also set up a safety plan for her (abusive relationship with child's father)

PT states he was in school and people were concerned about his face because someone "hit him and slapped him" When asked where he was hit he points at the left side of his chin. Pt goes on to mention he was also ""thrown"" onto the bed but his ""daddy told him it didn't happen"" Pt states he was being punished because he missed the school bus. I asked pt what normally happens when he's being punished and he replied that he [is] normally punished by getting hit with hands: belts, or cords. Pt goes on to tell me that he has bumps to the back of his head. When initially asked how did the bumps occur he says he fell on some weights when he tried to lift them and fell over (later on in the conversation patient mentions that his father hit on the side of the head and pointed toward the back side of his head on the right side; he then tells me that his father told him that he fell on some weights but ""its not the way my story is"")

When asked if the patient has been touched in any inappropriate manner "genitals, anus, any area of the body in … particular that would make him feel uncomfortable) or required to touch anyone else he said no. Pt lives in a 7 member home (3 siblings 13, 11, 9), grandfather, mother, and father.

….pt states that his face and the back of his head hurts."

30. Ms. Miller had difficulty setting up a home visit. In late May the attorneys arranged a visit and [Father] didn't want to do the home visit. Mother left a voicemail cancelling the visit. The attorneys got involved and Ms. Miller went to the home on a Friday afternoon. Mother was home but Father was not. Mother told Ms. Miller that the visit was cancelled. Mother did not want to do the visit without Father present. Eventually Mother allowed Ms.

Miller into the entryway of the home and to speak with the children in the entryway.

31. On 6-12-15 Mother arranged for Ms. Miller and GAL, Suzanne Conger, to visit the home and see the children. When Ms. Miller and Ms. Conger arrived Mother was not home. Father was home with the children.

32. Suzanne Conger has practiced law for thirty years and served as guardian ad litem for over 1,000 children. For three years Ms. Conger was head of custody advocate and guardian ad litem program in Charlotte, North Carolina. The Court finds Ms. Conger an experienced, qualified, and credible guardian ad litem.

33. Ms. Miller is concerned that there is domestic violence within the relationship between Father and Mother and a concern that Mother is not able to protect the children from domestic violence.

34. When Ms. Miller and Ms. Conger arrived on 6-12-15 Father was present with the four children. The children were lined up according to their ages on a loveseat. Father told the children to be respectful and knock on the door when they were finished and Father went outside the house. Ms. Conger then introduced herself to the children and she asked the three older children to give them some time to talk with [Child] alone. As they talked with [Child] Ms. Miller noticed a cell phone on the coffee table and mentioned it and [Child] yelled for his older brother to come and get the phone. [Ke'S.D.] got the phone and did a special knock on the door, one, two, three, four and Father opened the door and [Ke'S.D.] gave the phone to Father. When Father saw all four children were not still lined up at the door Father told the kids to "get out here". It was a rainy day with thunder but the older kids got their shoes on and went outside as Father ordered.

Ms. Conger and Ms. Miller continued their interview of [Child]. Ms. Conger observed that [Child] was confused,

scared and very careful with the way he said things. After they finished talking with [Child], [Child] went to the door and did the special knock and Father opened the door for him. Father told [Child] to get his shoes on and "get out here". Father grabbed [Child] by the back of his neck and ushered him out and [Child] cowered down. Ms. Conger demonstrated to the Court Father's grabbing of [Child]'s neck and [Child]'s cowering response. The Court notes Father's grabbing [Child] by the neck and ushering him out was unnecessary as [Child] was complying with the instructions Father gave him in front of Ms. Miller and Ms. Conger. The other children were outside with Father and could see Father grab [Child] by the neck and [Child]'s fearful response. The court finds this was a brazen attempt by Father to intimidate [Child], the other children, Ms. Miller and Ms. Conger. Father's actions were also consistent with his attempts to intimidate Ms. Fritsch during her interview of Father and his attempt to intimidate Ms. Miller later on 6-12-15. [Ke'T.D.], [Ke'S.D.] and [H.D.] were each interviewed separately and each did the special knock when they were finished.

35. After Ms. Miller and Ms. Conger interviewed all the children they were getting ready to leave and Father came back inside, got hostile, pointed at Ms. Miller and accused her of lying in court. Ms. Conger was concerned because Father was blocking her way out the door. Mother scooted around Father and offered to take Ms. Miller and Ms. Conger on a tour of the home. Mother then led Ms. Miller and Ms. Conger through the home and Father followed them. When they were upstairs Ms. Conger commented on their nice back yard and Father said to "stop that chatter". Mother immediately obeyed him and walked them through the rest of the house. Father did refuse for Ms. Conger and Ms. Miller to see the basement and they left. After they left Father called Ms. Miller and offered to let them see the basement. Neither Ms. Miller

nor Ms. Conger felt it was a good situation to return to the home on 6-12-15 given Father's hostile demeanor.

36. The children have access to the basement and hang out down there. DCS needed to see the basement. Father used intimidation to control what Ms. Miller and Ms. Conger saw on 6-12-15 and what they heard from the children and Mother.

37. The Court finds Ms. Miller and Ms. Conger credible.

38. Father is the pastor of the Martindale Church of Christ. Cedric Brown is a deacon in that church and sees the … family regularly at church and church functions. Mr. Brown has also been to the [Home] twice during the past eight years. Mr. Brown has not personally observed any inappropriate behavior by anyone in the … family. Mr. Brown explained that their church believes that discipline of children is an essential requirement of parents and that physical discipline can be appropriate. Mr. Brown did agree that physical discipline could cross the line and be inappropriate if the parent was beating up the child or throwing a six year old child into the wall.

39. Father testified on 7-1-15. Father stated he has primary responsibility for bringing up his son and total responsibility for his education. Father admitted that he intentionally slapped [Child] in the face on or about 4-28-15 or 4-29-15. Father demonstrated how he slapped [Child] and the Court heard the sound of his strike. Father admitted that he slapped [Child] once and [Child] was still standing so Father slapped him again and [Child] fell. Father weighs 325 pounds and is over six feet tall. [Child] weighed 61 pounds when he was examined by the doctors. Father is right handed and he was wearing a ring which was the same ring he wore in court. The ring appeared to be raised on the top similar to a college or sports ring. When Father demonstrated how he slapped [Child] the Court could hear the sound of Father's smack. Father

admitted that he wanted [Child] to feel the smack and he did not smack him on the bottom because [Child]'s clothes would cushion his blow. Father's ring caused the cut on [Child]'s face. For a right handed man to do that Father's strike must have been more of a closed fist and not open handed.

41. Father explained that he wakes the children up for school and they "police each other". Father stated that [H.D.] and [Child] leave right after [Ke'S.D.] in the mornings. Father does not remind the children that they need to go out for the bus. Father stated that waking them up and telling them one time to get ready for school is sufficient.

42. [Child] missed the bus on 4-28 or 4-29 the date Father injured [Child].

43. The Court does not believe Father's testimony that he progressively disciplines the children. When Father speaks he expects his children and Mother to obey him immediately. The Court finds Father is not credible.

44. Father did not tell Mother about his "discipline" of [Child] on 4-28 or 4-29.

45. The Court finds Father acted unreasonably on 4-28 or 4-29 when he smacked [Child] in the head twice with enough force to knock [Child] down—simply because [Child] missed the school bus that morning.

46. Missing the school bus is an inconvenient time management problem not direct disobedience. It is not unusual for a six year old to need reminding that he needs to be at the bus stop when the bus comes. [Child] is in the first grade. [Child] is the youngest child. He is unlikely to be able to influence the older children to miss the bus. Given his age [Child] would likely benefit from Father teaching him how to manage time and a reminder near the time the bus arrives.

It is unreasonable for a 324 pound man to deliberately hit a six year old child weighing 61 pounds in the head twice. [Child] was still standing from the first blow so Father hit him again until [Child] fell. Father's testimony about the nature of his blows is inconsistent with [Child]'s injuries as documented by the pictures and medical records. Punching a child in the head is dangerous.

47. Children who suffer physical abuse or witness domestic abuse between their parents often keep it a secret and do not talk with others about the abuse. The Court believes it is highly probable that Mother and the other children are also victims of Father's physical abuse but DCS did not prove it by a preponderance of the evidence.

CONCLUSIONS OF LAW

\* \* \* \*

11. DCS has proved by a preponderance of the evidence that [Child] is a child in need of services as defined in IC 31-34-1-1 in that his physical or his mental condition is seriously impaired or seriously endangered as a result of Father's use of excessive and unreasonable physical discipline on or about 4-28-15 and Father and Mother's refusal to recognize that Father's use of physical discipline was excessive and unreasonable on that date. [Child] needs parental supervision, guidance and correcting that is reasonable and safe. Without [the] Court's intervention [Child] will continue to be subject to unreasonable physical discipline from Father. Children who suffer unreasonable physical discipline suffer emotionally. [Child]'s doctor exam demonstrates that [Child] is very concerned for his Mother to the point he did not tell her what Father did to him. [Child] told his GAL that he was confused. Intimidating a child as Father has done causes a child to suffer emotionally. [Child] needs counseling which he is unlikely to receive without Court intervention.

12. A child is a CHINS when he is endangered by parental action or inaction.

13. In this case it is Father's actions and Mother's failure to protect [Child] that causes the court to find [Child] is a CHINS.

14. Much of the evidence is circumstantial but the cumulative effect of the evidence and concern of the experienced professionals causes the court to be very concerned for [Child]'s safety without court intervention.

    Father needs help to recognize appropriate discipline limits and Mother needs help to recognize appropriate discipline limits and enforce those limits and protect [Child] from excessive unreasonable physical discipline. Based on Father's testimony and his demeanor the Court concludes Father does not believe he did anything wrong at any time.

15. IC Code 31-34-1-15 specifically states:

    (1) "Limit the right of a parent, guardian, or custodian of a child to use reasonable corporal punishment when disciplining the child.

    (2) Limit the lawful practice or teaching of religious beliefs."

16. A CHINS case is a civil case not criminal. In _Willis v. State 888 N.E.2d 177 (2008)_ the Indiana Supreme Court recognized the right of parents to direct the upbringing and education of their children including the use of reasonable or moderate physical force to control behavior.

17. In _Willis_ Justice Rucker explained that Indiana adopted the Restatement of Law (Second) Torts and Justice Rucker outlined factors to be considered in determining the reasonableness of punishment. Justice Rucker stated:

    "The Restatement provides, "A parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his [or her] child as he [or she]

reasonably believes to be necessary for its proper control, training, or education."'" Restatement of the Law (Second) Torts, § 147(1) (1965). We adopt the Restatement View. Not only is it entirely consistent with the law in this jurisdiction, but also it provides guidance on the factors that may be considered in determining the reasonableness of punishment. It reads:

> In determining whether force or confinement is reasonable for the control, training, or education of a child, the following factors are to be considered:
>
> (a) whether the actor is a parent;
>
> (b) the age, sex, and physical and mental condition of the child;
>
> (c) the nature of his offense and his apparent motive;
>
> (d) the influence of his example upon other children of the same family or group;
>
> (e) whether the force or confinement is reasonably necessary and appropriate to compel obedience to a proper command;
>
> (f) whether it is disproportionate to the offense, unnecessarily degrading, or likely to cause Serious or permanent harm.

Restatement, *supra*, § 150. We hasten to add that this list is not exhaustive. There may be other factors unique to a particular case that should be taken into consideration. And obviously, not all of the listed factors may be relevant or applicable in every case. But in either event they should be balanced against each other, giving appropriate weight as the circumstances dictate, in determining whether the force is reasonable."

Therefore, the Court finds that [Child] is a child in need of services as alleged in the petition.

Father's App. pp. 37-47; 49-51.

[7] On September 23, 2015, the juvenile court issued dispositional and parental participation orders. (Mother's App. 77-81). The juvenile court ordered Parents, *inter alia*, to (1) complete parenting, domestic violence, mental health, and psychological assessments and follow resulting recommendations; (2) participate in home-based and family counseling; (3) contact their FCM weekly; (4) notify their FCM of any changes in household or contact information and of any arrests or criminal charges within five days; (5) allow DCS and GAL unannounced visits; (5) cease physical discipline of Child; (6) obtain DCS approval of Child's caregivers; (7) meet their own and Child's medical and mental health needs; and (8) reimburse DCS for services that benefit Child. (Mother's App. 73-75). In addition, Father was ordered to participate in the Father Engagement program and follow all recommendations thereof. (Mother's App. 75).

[8] Both Parents contend that there is insufficient evidence to sustain the juvenile court's adjudication that Child is a CHINS. Mother also contends that the juvenile court abused its discretion in ordering Mother to undergo certain evaluations and satisfy requirements allegedly unrelated to the CHINS adjudication.

# Discussion and Decision

[9] With respect to CHINS determinations, the Indiana Supreme Court has stated the following:

[a] CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the [juvenile] court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the [juvenile] court was clearly erroneous. *Id.*

…

There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.*, 919 N.E.2d at 105.

*In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (footnote omitted).

[10] Indiana Code section 31-34-1-1, on which the juvenile court based its disposition, provides that a child is a CHINS before the child becomes eighteen years of age if:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

   (A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[11] As the Indiana Supreme Court has observed,

> Juvenile law is constructed upon the foundation of the State's *parens patriae* power, rather than the adversarial nature of *corpus juris*. *Kent v. United States*, 383 U.S. 541, 554, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). Indeed, juvenile court jurisdiction "is rooted in social welfare philosophy rather than in the *corpus juris*." *Id.* The purpose of the CHINS adjudication is to "protect the children, not punish parents." *In re N.E.*, [919 N.E.2d 102, 106 (Ind. 2010)]. The process of the CHINS proceeding focuses on "the best interests of the child, rather than guilt or innocence as in a criminal proceeding." *Id.*

*In re K.D.*, 962 N.E.2d at 1255.

[12] Mother and Father argue that the juvenile court's finding that section 31-34-1-1 was satisfied constitutes an abuse of discretion because the record did not contain sufficient evidence that Child's physical or mental condition was seriously impaired or seriously endangered. DCS, however, was not required to establish that Child had already been harmed. "The CHINS statute … does not require that a court wait until a tragedy occurs to intervene." *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009) (citing *Roark v. Roark*, 551 N.E.2d 865, 872 (Ind. Ct. App. 1990)). "Rather, a child is a CHINS when he or she is endangered by parental action or inaction." *Id*. With this in mind, we conclude that the record contains ample evidence to support the juvenile court's disposition.

[13] Father argues first that his discipline of Child was reasonable. Father relies on the Indiana Supreme Court's decision in *Willis v. State*, 888 N.E.2d 177 (Ind. 2008), which addressed the scope of the parental privilege to discipline as a defense to criminal battery. Although a criminal case, we believe, as did the juvenile court, that the factors considered by the *Willis* court in evaluating whether punishment is reasonable are helpful here:

> In determining whether force or confinement is reasonable for the control, training, or education of a child, the following factors are to be considered:
>
> > (a) whether the actor is a parent;
> >
> > (b) the age, sex, and physical and mental condition of the child;
> >
> > (c) the nature of his offense and his apparent motive;
> >
> > (d) the influence of his example upon other children of the same family or group;
> >
> > (e) whether the force or confinement is reasonably necessary and appropriate to compel obedience to a proper command;
> >
> > (f) whether it is disproportionate to the offense, unnecessarily degrading, or likely to cause serious or permanent harm.

*Id.* at 182 (citation omitted).

[14] Father's status as Child's parent confers upon him greater latitude to punish Child than other adults would have. Although all indications are that Child is generally healthy, Child was only six years old and weighed sixty-one pounds when examined after the incident that gave rise to this CHINS proceeding. In contrast, Father weighed over 300 pounds and stands over six feet tall. Child's

offense was missing the school bus, and there is no indication that he was motivated by any desire to wilfully misbehave. As for the possible effect of Father's discipline of Child on the other children, there is no indication that any of Child's siblings had problems with missing the school bus or were present when Father struck Child. All in all, the first four *Willis* factors would seem to weigh only slightly against Father's discipline being reasonable, mainly due to the lack of any evidence of willful disobedience on Child's part.

[15] The last two factors, however, weigh heavily against any conclusion that Father's actions were reasonable. Father admitted to striking Child twice in the head on or about April 29, 2015, and the juvenile court found that, based on the physical evidence, Father likely struck him with a closed fist. This level of force is disproportionate to Child's offense, especially given the extremely large size difference between Father and Child. It seems to us that any number of less-forceful options should have been tried before the one Father chose.[1] Moreover, striking Child in the head with enough force to knock him off of his feet seems likely to cause serious harm. Even if the blows themselves did not cause serious harm, a fall easily could have. Our consideration of the *Willis* factors leads us to the conclusion that Father's use of force on Child was unreasonable.

---

[1] Father testified that he practiced progressive discipline and that less extreme options had failed to correct Child's behavior with respect to missing the school bus, but the juvenile court specifically found this testimony to be incredible.

[16] Mother and Father also both argue that the incident was isolated, even if Father's actions were unreasonable. The record and the juvenile court's findings seriously undercut this argument. The record indicates a history of violence between Father and Mother and previous DCS involvement related to substantiated reports of abuse of another child. In 2003, Father was arrested and charged with breaking and entering Mother's apartment and domestic violence against her. Mother has been arrested and charged with battery of Father. In 2006 and 2008, DCS became involved due to allegations that Mother had inappropriately disciplined one of Child's older siblings.

[17] Moreover, there is no indication that either Father or Mother feels that Father did anything wrong. Father has shown no remorse for the incident, testifying that physical discipline is part of his faith and that his discipline of Child on the occasion in question was "appropriate[.]" Tr. p. 136. Mother agreed with Father's assessment, verifying that she saw "nothing wrong" with Father striking Child. Tr. p. 204. Parents' failure to recognize the unreasonableness of Father's actions makes it likely that similar situations will arise in the future. The history of violence in Child's family, along with Parents' failure to recognize that Father did anything wrong, undercut any notion that the incident in question was isolated. DCS produced sufficient evidence to sustain a finding that Child's physical or mental condition is seriously impaired or seriously endangered.

## II. Whether the Juvenile Court Abused its Discretion in Ordering Mother to Participate in Certain Services

[18] Mother contends that the juvenile court abused its discretion in ordering her to (A) undergo psychological and mental health evaluations and comply with resulting recommendations; (B) undergo a domestic violence evaluation; (C) maintain suitable housing; not permit possession or use of illegal substances in the Home; maintain a legal and stable source of income; see to it that Child is properly clothed, fed, supervised, and enrolled in school; (D) meet her own and Child's medical and mental health needs; (E) refrain from using any form of physical discipline; and (F) reimburse DCS for services to benefit the Child.

## A. Psychological and Mental Health Evaluations

[19] Mother argues that there is no evidence to support the juvenile court's order that she undergo psychological or mental health evaluations. The record contains evidence, however, that Mother is subject to high levels of stress, which may be causing atypical behavior and affecting her mental health. When Dr. Patton asked Mother what happened to Child, Mother did not respond at all, which Dr. Williams indicated was not typical. Moreover, the hospital social worker observed that Mother avoided eye contact, was unresponsive, and became tearful when asked about safety in her home. Parents' history and Mother's demeanor indicate that her situation might well be affecting her mental health. The juvenile court did not abuse its discretion in ordering Mother to submit to mental health evaluations.

## B.  Domestic Violence Evaluations

[20]  Mother argues that because there were no substantiated instances of domestic violence between Parents arising from the instant CHINS investigation, the juvenile court abused its discretion in ordering her to undergo a domestic violence evaluation.  When first interviewed about the alleged abuse of Child, however, Mother would not deny the existence of domestic violence in the Home.  Also, when Child was asked about whether he had seen Father hit Mother, he looked at Mother, and asked her to answer "because she knows[.]"  State's Ex. 3 p. 1.  At this, Mother became quiet, tears welled up in her eyes, and she assured Child that "I am okay" and "I am all right[.]"  State's Ex. 3 p. 1.  When Dr. Patton asked Mother if she felt safe in the relationship, she looked away and did not respond.  The record also indicates that Mother was aware of violence involving the children.  When Child told Dr. Patton that Father hit him in the back of the head, Child looked at his Mother and said "you know what's going on or mom knows[.]"  Tr. p. 69.  Mother did not verbally respond to Child's statement but instead "looked sad."  Tr. p. 69.

[21]  Moreover, Mother and Father both acknowledge that police have been involved with their family in the past due to allegations of domestic violence.  Mother and Father have both been arrested and charged with domestic violence allegedly perpetrated on the other.  Finally, this case represents the third time that DCS has been involved with the family, the previous two cases involving substantiated abuse of one of Child's siblings.  Given the history of domestic

violence in the family, the juvenile court did not abuse its discretion in this regard.

## C.  Maintain Suitable Housing; Not Permit Possession or Use of Illegal Substances in the Home; Maintain a Legal and Stable Source of Income; See to it that Child is Properly Clothed, Fed, Supervised, and Enrolled in School

[22]  Mother characterizes the above-listed requirements as boilerplate and argues that they should therefore be eliminated.  Boilerplate or not, we see nothing particularly controversial about the requirements at issue, many of which the law already requires of Mother.  Taken together, the challenged terms require nothing more of Mother than that she remain a fit parent who has the means to safely care for Child and does so.

## D.  Meet Mother's and Child's Medical and Mental Health Needs

[23]  Mother argues that the order that she meets Child's medical and mental health needs represents an invasion into her constitutionally-protected liberty interest in remaining free of unwarranted intrusions into the mind and body.  "[O]ur Supreme Court has recognized that competent adults are entitled to make informed decisions about their medical care and that of their children."  *In re A.M.-K.*, 983 N.E.2d 210, 216 (Ind. Ct. App. 2013).

[24]  Mother relies on our decision in *A.M.-K.*.  In *A.M.-K.*, the appellant argued the juvenile court's order that she take all medications as prescribed infringed upon right to direct her own medical treatment.  *Id*. at 216.  We agreed, noting that

the appellant presented evidence that the medication at issue had serious side effects, interfered with her heart condition, and clashed with her religious beliefs. *Id*. at 217. Mother has presented no such evidence here. There is no evidence that Mother has been directed by a medical professional to do anything in particular for Child, much less something to which she has raised any particular objection. Mother's reliance on *A.M.-K.* is unavailing, and she has failed to establish an abuse of discretion in this regard.

## E. Refrain from Physical Discipline

[25] We recognize that "parents do have the right to use reasonable corporal punishment to discipline their children." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 378 (Ind. Ct. App. 2007). "However, just as a parent's right to raise his or her children is not absolute, we find no authority for the proposition that a parent's right to use reasonable corporal punishment is absolute and cannot in some instances be subordinated to a child's interests." *Id*. We conclude that this case is one of those instances.

[26] Here, we have already concluded that the discipline that gave rise to this CHINS proceeding was unreasonable. It would be one thing if Father and Mother recognized this. Neither Father nor Mother, however, acknowledges the unreasonableness of Father's actions or seems inclined to participate in court-ordered services in good faith. DCS's primary responsibility must be Child's safety. Ind. Code § 31-34-21-5.5(a) ("In determining the extent to which reasonable efforts to reunify or preserve a family are appropriate under this chapter, the child's health and safety are of paramount concern."). So long

as neither Parent recognizes the difference between reasonable and unreasonable corporal punishment, the order to refrain from any form of physical discipline does not represent an abuse of discretion.

## F. Reimburse DCS for Services

[27] The juvenile court's disposition provides, in part, that Parents "shall reimburse to the Local Office of the Department of Child Services, expenses for services to benefit the child." Indiana Code section 31-40-1-3(a) provides, in part, that "[a] parent [of] a child adjudicated a delinquent child or a child in need of services … is financially responsible as provided in this chapter … for any services provided by or through the department." Section 31-40-2-3(c) provides, in part that

> the juvenile court shall order the child's parents or the guardian of the child's estate to pay for, or reimburse the department for the cost of services provided to the child or the parent or guardian unless the court makes a specific finding that the parent or guardian is unable to pay or that justice would not be served by ordering payment from the parent or guardian.

[28] The juvenile court's order is entirely consistent with the relevant provisions of Indiana Code section 31-40-2-3. Moreover, while it seems reasonable that Parents should be able to challenge reimbursement requests they consider to be unreasonable, there is no indication that any requests have been made. Consequently, we conclude that the issue is not ripe for adjudication. *Ind. Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt.*, Inc., 643 N.E.2d 331, 336 (Ind. 1994) ("Ripeness relates to the degree to which the defined issues in a case are based

on actual facts rather than on abstract possibilities, and are capable of being adjudicated on an adequately developed record."). Without reimbursement requests, there is nothing to review. Mother has failed to establish an abuse of discretion.

# Conclusion

[29] We conclude that there is sufficient evidence to sustain the juvenile court's adjudication that Child is a CHINS. We further conclude that the juvenile court did not abuse its discretion in ordering Mother to participate in certain services.

The judgment of the juvenile court is affirmed.

Bailey, J., and Altice, J., concur.